**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

JUSTIN COHEN, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

LIGHTNING EMOTORS, INC.,
TIMOTHY R. REESER,
TERESA P. COVINGTON,
GIGACQUISITIONS3, LLC,
GIGCAPITAL GLOBAL,
AVI S. KATZ,
RALUCA DINU, and
GIGFOUNDERS, LLC,

      Defendants.

---

**PLAINTIFF'S CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

---

Plaintiff Justin Cohen ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC"), filings by Lightning eMotors, Inc. f/k/a GigCapital3, Inc. ("Lightning eMotors" or the "Company") and securities analyst reports, press releases, and other public statements issued by, or about, the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all purchasers of Lightning eMotors securities (the "Class") between December 10, 2020 and August 16, 2021, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.

3.      Venue is proper in this District under § 27 of the Exchange Act, (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)-(d).  Lightning eMotors maintains its principal executive offices in this

District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

5.      Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased Lightning eMotors securities during the Class Period and has been damaged thereby.

6.      Defendant Lightning eMotors is an electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets.  Lightning eMotors common stock and warrants trade on the NYSE under the ticker symbol "ZEV" and "ZEV.WS," respectively.   Prior to the Merger (defined below), Lightning eMotors was named GigCapital3, Inc. ("GigCapital3"), and its stock, warrants and ownership units traded under the symbols "GIK," "GIK.WS," and "GIK.U," respectively.   Lightning eMotors is a Delaware Corporation with headquarters in Loveland, Colorado.

7.      Defendant Timothy R. Reeser ("Reeser") is a co-founder of Lightning eMotors and served as the Company's President and Chief Executive Officer ("CEO") throughout the Class Period.

8.      Defendant Teresa P. Covington ("Covington") has served as Lightning eMotors' Chief Financial Officer ("CFO") since January 2021.

9.      Defendant GigAcquisitions3, LLC ("GigAcquisitions3") served as the blank check sponsor of Lightning eMotors.

10.     Defendant Avi S. Katz ("Katz") is the founder and manager of Defendant GigAcquisitions3.  Prior to the Merger, defendant Katz was CEO, President, and Secretary of GigCapital3.  Prior to and immediately after the Merger, defendant Katz was also the Chairman (and later Co-Chairman) of the Board of GigCapital3.  Through his investment group defendant GigCapital Global, for which he serves as a founding managing partner together with his wife defendant Raluca Dinu, Defendant Katz is a serial sponsor of blank check companies, having sponsored at least six blank check companies since 2017.

11.     Defendant Raluca Dinu ("Dinu") is the wife and business partner of defendant Katz. Prior to and immediately after the Merger, defendant Dinu was a board member of GigCapital3. Like defendant Katz, defendant Dinu is a founding managing partner of Defendant GigCapital Global and a serial sponsor of blank check companies.

12.     Defendant GigCapital Global describes itself as a "serial SPAC issuer and the first Private-to-Public Equity [] business and technology executive group dedicated to taking late-stage, high quality private [technology, media and telecommunications] companies to the public market" through its "'IPO-in-a-box' methodology.'"  At the direction of defendants Katz and Dinu, defendant GigCapital Global established GigAcqusitions3 and GigCapital3 to effectuate the fraudulent scheme detailed herein.

13.     Defendant GigFounders, LLC ("GigFounders") is an LLC owned and controlled by defendants Katz and Dinu.  Defendant GigFounders has a voting and financial interest in GigAcquisitons3.  In addition, defendants Katz and Dinu caused GigCapital3 to enter into a

lucrative services agreement with GigFounders, pursuant to which GigCapital3 agreed to pay $20,000 per month to GigFounders until the consummation of the Merger. Defendants Katz and Dinu also received substantial "advisory fees" from GigCapital3.

14.     Defendants GigAcquisitions3, GigFounders, GigCapital Global, Katz, and Dinu are collectively referred to herein as the "Blank Check Sponsor Defendants."

15.     Defendants Reeser, Covington, Katz, and Dinu are collectively referred to herein as the "Individual Defendants." Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about Lightning eMotors' business, operations, services, acquisition plans, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

16.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company and/or GigAcquisitions3 at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

17.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a

duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.   In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company and/or GigAcquisitions3, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

19.     Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lightning eMotors securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Lightning eMotors' business, operations, services, and present and future business prospects; (b) enabled Lightning eMotors to complete an initial business combination, thereby triggering lucrative incentive payouts for certain Company

insiders, as detailed herein, during the Class Period; and (c) caused plaintiff and the Class to purchase Lightning eMotors securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

20.     Lightning eMotors began as GigCapital3, a blank check company formed by the Blank Check Sponsor Defendants.  A blank check company is sometimes referred to as a special purpose acquisition vehicle, or "SPAC," and does not initially have any operations or business of its own.  Rather, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.  As a result, investors in blank check companies rely on the skill, transparency and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

21.     Lightning eMotors designs, manufactures, and sells electric vehicles.   The Company produces electric fleet medium- and heavy-duty vehicles, including delivery trucks, shuttle buses, passenger vans, chassis-cab models, and city transit buses.

22.     On or about May 18, 2020, GigCapital3 completed its initial public offering, selling 20 million ownership units to investors at $10 per unit for gross proceeds of $200 million (the "IPO").  Each unit consisted of one share of common stock and three-fourths of one redeemable warrant.  The IPO was sponsored by defendant GigAcquisitions3, a strategic advisory firm owned and controlled by defendant Katz, which in turn was managed by defendant GigCapital Global, an investment advisory group controlled by defendants Katz and Dinu.

23.    While GigCapital3 did not identify any target companies at the time of the IPO, the IPO offering materials stated that the Company planned to pursue an acquisition focused in the technology, media and telecommunications ("TMT") industry.   The IPO offering materials claimed that GigCapital3's "management team's distinctive background and record of acquisition and operational success could have a significant impact on target businesses," and the management team's "significant hands-on experience helping TMT companies" would "optimize their existing and new growth initiatives."  The IPO offering materials also stated that, utilizing the management team's "extensive experience" and "network of contacts," would "enhance stockholder value."

24.    The IPO offering materials provided "Business Combination Criteria" that GigCapital3 would purportedly use to evaluate target companies which included the following:

- *Companies that embrace today's digital transformation and experience*…we will focus on sustainable technology companies that can shape a better society and healthier environment.

- *Companies that will benefit from being a public listing*…and that will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publically traded company in furtherance of growth.

- *Companies that will benefit from our industry expertise and relationships*…

- *Companies that are market-leading participants*. We will seek a target that has an established business and market position….

- *Companies that are small and mid-sized businesses*….

- *Companies with strong management*….

25.    Pursuant to the IPO prospectus, GigCapital3 was required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds and to do so within 18 months of the May 2020 IPO.  In the event GigCapital3 did

not complete an initial business combination, the Company was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a deal would not be economically feasible.

26.     However, if GigCapital3 was successful in completing an initial business combination within the allotted time frame, defendants Katz and Dinu, through their closely controlled entities defendants GigAcquisitions3 and GigFounder, would be richly rewarded.  Specifically, GigCapital3 had issued founder shares in connection with the IPO equal to approximately 21.8% of the Company's outstanding common shares after the IPO. Essentially all of these founder shares were held by defendants Katz and GigAcquisitions3.  According to IPO offering materials, these founder shares had a market value of $63.1 million prior to the Merger but would expire worthless if the Company failed to complete its initial business combination.  In addition, GigAcquisitions3 had purchased $6.5 million worth of private placement units prior to the Merger, which would be negatively impacted by a failure to consummate an initial business combination (*e.g*., by rendering the warrant component of the units worthless).  As a result, the Blank Check Sponsor Defendants were highly incentivized to complete an initial business combination and to convince shareholders to approve the Merger.

27.     On December 10, 2020, GigCapital3 issued a release announcing that it had entered into a merger agreement with Lightning eMotors, to be funded by cash from the IPO, the issuance of $539 million in new common stock of GigCapital3 to current holders of Lightning eMotors securities, and $125 million of gross proceeds from the issuance of equity and convertible

financings in a Private Investment in Public Equity ("PIPE") transaction (the "Merger").  As a result of the Merger, the current holders of Lightning eMotors securities were expected to hold approximately 66% of the issued and outstanding shares of common stock of the combined Company.

28.     The December 10, 2020 release described Lightning eMotors as a "leading innovator" in the U.S. commercial electric vehicle market and a "high-growth electric vehicle manufacturer."  The release also represented that Lightning eMotors was experiencing tremendous growth and was on track for production to reach 20,000 medium duty commercial electric vehicles by 2025.  The release highlighted Lightning eMotors' purported "high visibility" into future revenue, with "100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today, and strong line of sight to $2 billion in projected 2025 revenue, including $1 billion from existing fleet customers."

29.     On March 26, 2021, defendants issued the final proxy statement for the Merger which urged shareholders to vote in favor of the deal and (as detailed below) contained numerous materially false and misleading statements and omissions (the "Proxy").  Specifically, the defective Proxy misrepresented Lightning eMotors' business, financials and prospects, claiming, *inter alia*, that: (a) the Company had "optimized" its supply chain for quality, reliability and cost and built in effective redundancies to prevent supply chain disruptions; (b) Lightning eMotors was positioned to reduce cost by up to 50% over the next eighteen months; and (c) Lightning eMotors was continuing to achieve considerable revenue growth and on track to achieve $63 million in 2021 revenues.

30.     On the basis of the defective Proxy, on April 21, 2021, shareholders voted to approve the Merger at a special shareholder meeting.  Following the consummation of the Merger on May 6, 2021, GigCapital3 changed its name to Lightning eMotors.

31.     Almost immediately after the Merger, Lightning eMotors began to revise down the 2021 projections previously provided by defendants, reducing 2021 revenue guidance on May 17, 2021 to a range of $50 million to $60 million.  However, defendants continued to issue materially false and misleading statements regarding the true state of Lightning eMotors' business, operations and prospects.

32.     Then, on August 16, 2021, Lightning eMotors issued a release announcing the Company's financial results for the second quarter ended June 30, 2021.  Despite defendants' prior claims that "100%" of 2021 revenue was already under contract, the release stated that Lightning eMotors would not meet guidance for 2021.  The release also stated that the Company had a net loss per share of $0.79 compared to a loss of $0.10 in the second quarter of 2020.

33.     On this news, the price of Lightning eMotors stock fell 23% over the next three trading days to close at $7.44 per share on August 19, 2021 on abnormally heavy trading volume.

34.     On November 15, 2021, Lightning eMotors issued a release announcing the Company's financial results for the third quarter ended September 30, 2021.  The release stated that Lightning eMotors had generated only $16.8 million in revenue for the first nine months of the year and was on track to generate only $4 million to $6 million more in revenue during the fourth quarter.  Thus, even assuming the best case revenue scenario, Lightning eMotors would generate only 36% of the revenues purportedly "under firm purchase orders" prior to the Merger.

- 10 -

The Company's net loss for the first nine months of the year totaled $123 million, nearly five times more than during the corresponding period in 2020.

35.     As of market close on November 22, 2021, the price of Lightning eMotors remained below $8 per share, over 50% below the Class Period high.  As a result of the decline in the price of Lightning eMotors stock, investors have suffered millions of dollars in losses.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

36.     The Class Period begins on December 10, 2020. On that date, GigCapital3 and Lightning eMotors issued a joint release announcing the Merger agreement.  The release characterized Lightning eMotors as a "high-growth electric vehicle manufacturer" and "the leading innovator in the US commercial medium-duty electric vehicle ("EV") market."  The release represented that the Company had "*[h]igh revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today*."  The release further stated that the Company was on track for production "to reach 20,000 medium duty commercial vehicles by 2025" and claimed the Company had a "strong line of sight to $2 billion in projected 2025 revenue."  In the release, defendant Reeser stated that the "capital raised in this transaction will enable Lightning eMotors to accelerate its growth plans and fulfill significant demand from our customers."  Similarly, defendant Dinu stated that the "combination of Lightning eMotors and GigCapital3 brings unique, attractive, and promising opportunities to all stockholders and stakeholders, while substantiating our commitment to support one of the highest impact mega-trends of our lifetime, electrification of mobility solutions."

37.     On January 4, 2021, GigCapital3 filed a slide deck discussing the Merger on Form 425 with the SEC.  The slide deck listed a "key investment highlights" the Company's "Robust

Contracts with Financial Visibility," including because it purportedly had "**100% of 2021 revenue forecast contracted as of Q3 2020**."  The slide deck also asserted that Lightning eMotors' ability to work with multiple supply chain partners "has prevented major disruptions in production."  The slide deck further stated that Lightning eMotors "has added and built additional redundancies into the supply chain…**to mitigate supply chain risk**."

38.     On March 26, 2021, GigCapital3 filed with the SEC the Proxy for the Merger.  The Proxy stated that the Board recommended shareholders vote to approve the Merger at the special meeting of shareholders scheduled for April 21, 2021.  The Proxy stated that Lightning eMotors was on track to achieve $63 million in revenue in 2021 with a 14% gross profit margin, and $354 million in 2022 with a 19% gross profit margin, providing the following chart of financial results and growth trends:

### Lightning Systems Key Financials

| ($ in million, unless otherwise noted) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $    9 | $   63 | $354 | $640 | $1,165 | $2,012 |
| Gross Growth | NM | NM | 462% | 81% | 82% | 73% |
| Gross Profit | $    0 | $    9 | $  68 | $140 | $  296 | $  528 |
| Gross Margin | 3% | 14% | 19% | 22% | 25% | 26% |
| Adjusted EBITDA | ($   11) | ($  17) | $  15 | $  50 | $  155 | $  315 |
| Adjusted EBITDA Margin | (122%) | (27%) | 4% | 8% | 13% | 16% |

39.     The purported reasons shareholders should approve the Merger stated in the Proxy included, *inter alia*, Lightning eMotors' "Strong Customer Demand," as well as its "Competitive Advantages In Cost of Ownership and Fueling Infrastructure" and "Vehicle Performance."  The Proxy stated that among the Company's competitive advantages were its "ability to offer cost effective solutions" due to "long term relationship[s] with supply chain partners [that] ha[d] prepared [Lightning eMotors] to scale in a cost effective manner."

- 12 -

40.     The Proxy represented that Lightning eMotors had "optimize[d its] supply chain for quality, reliability, and cost" and "maintain[ed] a high degree of resilience in our supply chain" in order to "mitigate delays."  The Proxy also stated that "careful supply chain management" by Lightning eMotors "can reduce our cost-of-goods sold by up to 50% over the next 18 months." Further, the Proxy stated that "continuous communication and partnerships with all of our suppliers has enabled [Lightning eMotors] to maintain cutting-edge technology in [its] vehicles at the lowest possible cost."  The Proxy represented that Lightning eMotors expected to "continue[ ] to reduce vehicle costs through economies of scale and contract-based cost reductions across the supply chain."

41.     Defendants' statements referenced in ¶¶ 36-40 above were materially false and misleading when made because they misrepresented and failed to disclose adverse facts about Lightning eMotors' business, operations and prospects which were known to Defendants or recklessly disregarded by them as follows:

(a)     That Lightning eMotors was suffering from severe supply chain constraints and cost overruns;

(b)     That Lightning eMotors was experiencing delays in vehicle deliveries and more tepid customer demand than represented to investors;

(c)     That Lightning eMotors did not possess "firm" purchase orders and/or an ability to deliver on such orders sufficient to generate $63 million in revenue in 2021;

(d)     That Lightning eMotors considered purchase orders to be "firm" even if they were non-binding, did not constitute a legal obligation to purchase, and could be canceled or delayed by customers without penalty;

(e)     That Lightning eMotors did not possess "high visibility" into 2021 revenues, let alone its business and operations in subsequent years;

(f)     That Lightning eMotors was suffering from ballooning costs and worsening gross margin trends; and

(g)     That, as a result of (a)-(f) above, Lightning eMotors' 2021 guidance was not achievable and lacked any reasonable basis in fact.

42.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303") required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."  The failure of the Company's periodic SEC filings to disclose the fact that the Company's purchase orders were infirm and/or that the Company was unable to deliver on such orders and suffering from supply chain constraints and cost overruns violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Lightning eMotors securities speculative or risky.

43.     On April 12, 2021, GigCapital3 filed supplemental disclosures for the Proxy on Form 8-K in response to shareholder litigation.  Among the new disclosures, the Form 8-K stated that "During the period between November 13, 2020 and November 17, 2020 that the Company was working with Oppenheimer and Nomura on a potential convertible note financing, Lightning Systems informed the Company that it was in the process of revising some of the financial projections previously provided to the Company for fiscal year 2020 *as a result of Lightning Systems determining that it was projecting fewer delivery of vehicles during the then-current quarter than previously projected which would result in less revenue*."

44.     In part due to this disclosure, between April 13, 2021 and April 20,2021, the price of Lightning eMotors stock declined $2.30 per share, or 23%, on abnormally high trading volume. However, because defendants failed to disclose the truth about the Company's business operations and financial results, the price of Lightning eMotors securities remained artificially inflated.

45.     On May 17, 2021, GigCapital3, which had been renamed Lightning eMotors following the May 6, 2021 Merger close, issued a release announcing the Company's financial results for the first quarter ended March 31, 2021 ("1Q21 Release").  The release stated that Lightning eMotors generated revenue of $4.6 million, a 557% increase from the $0.7 million revenue in the first quarter 2020.  The release also lowered 2021 guidance, stating that "based on current business conditions," for the full year 2021, the Company expects "revenues to be in the range of $50 million to $60 million."  Despite the lowered guidance, the release stated that Lightning eMotors remained well-positioned to continue robust growth plans and navigate supply chain headwinds.  For example, the release stated that, "despite supply chain headwinds," the Company achieved "sales of 31 zero-emission commercial vehicles."  In the release, defendant

Reeser added that "Q1 2021 continued the fast sales and delivery growth that started in 2020" and that Lightning eMotors "is **well-positioned to achieve its [revised] 2021 forecast**," despite "supply chain shortages."  Defendant Reeser continued in pertinent part as follows:

> "We are delivering purpose-built commercial zero-emission vehicles today from a factory that is already in production, continuing to add to our two years of customer on-the-road experience, validation and data. Q1 2021 continued the fast sales and delivery growth that started in 2020. ***As our production capacity, supply chain diversification, automation implementation, and marketing efforts increased, so did our abilities to execute deliveries at a record pace. As a result, Lightning eMotors is well-positioned to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles.*** Our results, and the head start that our data, production experience and customer validation provide us, demonstrates the value of real purchase orders and real deliveries."

> \*       \*       \*

> "…The capital raised in the merger transaction ***will enable Lightning eMotors to accelerate its growth plans and fulfill significant demand from our customers***, including some of the most recognizable transportation, public safety and e-commerce companies in the U.S. We are excited to begin our next chapter as a public company."

> \*       \*       \*

> ***"Lightning eMotors' broad portfolio of products allows us to deliver despite the current supply chain unpredictability***, as we can move production to products for which we have chassis and components on-hand. Even with our battery supply, we have multiple pack suppliers supporting multiple platforms and applications, providing a safety net against any single supplier constraint…"

46.     Also on May 17, 2021, Lightning eMotors filed with the SEC a quarterly report for the first quarter of 2021 on Form 10-Q. The report was signed by defendants Reeser and Covington, who also signed certifications attesting to the report's accuracy and completeness.  The report included the quarterly financial results provided in the 1Q21 Release.

47.     On June 17, 2021 – with less than two weeks left in Lightning eMotors' second fiscal quarter – the Company held an Analyst Day hosted by defendants Reeser and Covington.

During her presentation, defendant Convington stated, "Updated fiscal 2021 guidance. **We are reaffirming our revenue range of $50 million to $60 million.** Last month, we announced a small negative gross margin. **Here we're providing guidance of minus 2% to minus 4% gross margin**."

48.     On July 8, 2021, Lightning eMotors filed with the SEC a prospectus on Form 424B3 (the "Prospectus").  The Prospectus stated that Lightning eMotors was positioned to take advantage of "a significant total addressable market of approximately $67 billion" and had "built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth." The Prospectus added in relevant part as follows:

> **We optimize our supply chain for quality, reliability, and cost. We believe our long- term relationships with supply chain partners will be a key driver in our ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for our growth. Because we have relationships with multiple suppliers for each core component of our vehicles, we are able to build and maintain a high degree of resilience in our supply chain, which will assist us with mitigating delays**. We also partner with battery pack manufacturers allowing us to keep the latest battery technology in our vehicles at the time of manufacturing. To this end, we have recently entered into a three-year contract with our primary battery supplier, Romeo Power Technology, that will secure battery inventory without significant fluctuations in cost. **We believe, that through careful supply chain management and the cultivation of long-term relationships with our suppliers, we can reduce our cost-of-goods-sold by up to 50% over the next 18 months. Continuous communication and partnerships with all of our suppliers has enabled us to maintain cutting-edge technology in our vehicles at the lowest possible cost**.

49.     The Prospectus also listed a number of "competitive advantages" possessed by Lightning eMotor that purportedly "will allow us to maintain and extend our leadership position, including, *inter alia*: (i) "Our factory and supply chain are optimized to offer solutions to highly segmented and customized markets in the Class 3 to 7 ZEV markets"; (ii) Lightning eMotors' ability to "address the diversified opportunities in the markets we serve in a cost-effective manner"; (iii) "Through years of effort and cumulative customer validation, we have now reached the tipping

- 17 -

point of an accelerated sales cycles which is expected to fuel our next phase of growth"; and (iv) "Established strategic partnerships [that] enable us to scale in a relatively asset light and cost-effective manner."

50.     Finally, the Prospectus stated that, pursuant to its "growth strategy," Lightning eMotors would, *inter alia*: (i) "capitalize on increasing regulatory and customer demands for commercial emission free vehicles" by, for example, "continu[ing] to aggressively pursue demand for increased ZEV adoption"; (ii) "continue to win new customers and expand into new markets" by leveraging its strategic partners; (iii) "continue executing land-and-expand," whereby the Company "win[s] repeat orders from" existing customer.

51.     Then, on August 16, 2021, after the market closed, Lightning eMotors issued a release providing its financial results for the second quarter ended June 30, 2021 – the same quarter in which the Merger was consummated.   In the release, defendant Reeser revealed that the Company's "Q2 revenue was constrained by supply chain challenges" which had caused 2021 to be "a challenging year," as "orders are being pushed to 2022 due to unexpected chassis production disruptions and Covid related delays."   Further, the release stated the Company was withdrawing its guidance for 2021 as it "no longer expects to meet full year guidance."   Further, in the release, the Company revealed a net loss of $46.1 million for the quarter which resulted in a $0.79 diluted net loss per share, compared to a net loss of $2.8 million, or $.10 diluted net loss per share, in the prior year period.   The Company's gross margin also worsened to -19% during the quarter, as compared to -16% in the first quarter of 2021.   During an earnings call to discuss the results, defendant Covington admitted that the Company considers purchase orders to be "firm" even if

they are "non-binding," did "not constitute a legal obligation," and "may be canceled or delayed by customers without penalty."

52.   On this news, the price of Lightning eMotors stock price fell from $9.63 when the market closed on August 16, 2021 to $8.00 when the market closed on August 17, 2021, a 17% decline in value, on abnormally high trading volume.  The stock price continued to decline in subsequent days, closing at $7.44 per share on August 19, 2021.

53.   On November 15, 2021, Lightning eMotors issued a release providing its financial results for the third quarter ended September 30, 2021.  The release stated that the Company had only generated $16.8 million during the first nine months of 2021, while suffering a $123 million net loss.  The release stated that Lightning eMotors expected to generate only $4 million to $6 million in revenue during the fourth quarter, while suffering an adjusted EBITDA loss in the range of $13 million to $15 million.  As a result, the Company was on track to materially underperform the 2021 figures provided to investors in the Proxy and other statements made during the Class Period.

54.   As of market close on November 22, 2021, the price of Lightning eMotors remained below $8 per share, over 50% below the Class Period high.

55.   The market for Lightning eMotors securities was open, well-developed and efficient at all relevant times.  As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, Lightning eMotors securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Lightning eMotors securities relying upon the integrity of the market price of these securities and market information relating to Lightning eMotors, and have been damaged thereby.

- 19 -

56.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Lightning eMotors securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

57.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Lightning eMotors' business, competition, acquisition plans and operations. These material misstatements and omissions had the cause and effect of creating in the marketplace an unrealistically positive assessment of Lightning eMotors, its business, profitability, growth trends, and financial prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing Lightning eMotors securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

58.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Lightning eMotors' management, competitive landscape, their control over, and/or receipt and/or modification of Lightning eMotors' allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Lightning eMotors, participated in the fraudulent scheme alleged herein.

59.      The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  Given their executive-level positions with Lightning eMotors and/or the Blank Check Sponsor Defendants, the Individual Defendants controlled the contents of Lightning eMotors' public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

60.      Plaintiff also alleges that scienter of the Individual Defendants (who, as executive officers and control persons of the Company and/or the Blank Check Sponsor Defendants, knew or recklessly ignored facts related to the core operations of Lightning eMotors) can be imputed to Lightning eMotors.

61.     Further evidencing their scienter, defendants had the motive and opportunity to commit fraud.  The Merger allowed the Blank Check Sponsor Defendants to secure tens of millions of dollars in equity in the combined Company that they would not otherwise receive and for the officers and directors of Lightning eMotors to receive desirable positions in a publicly traded company, Lightning eMotors.  It also allowed the Individual Defendants to receive lucrative payouts, compensation and incentive awards in connection with their positions as officers and directors of Lightning eMotors following the Merger and/or as shareholders of the target company acquired in the Merger.

62.     Given defendants' knowledge of and their misleading statements about Lightning eMotors' acquisition plans, business and prospects made contemporaneously with that knowledge, defendants' materially false and/or misleading statements alleged herein were made willfully and caused Lightning eMotors securities to trade at artificially inflated prices during the Class Period.

## LOSS CAUSATION

63.     As detailed herein, during the Class Period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lightning eMotors securities.  This scheme operated as a fraud or deceit on Class Period purchasers of Lightning eMotors securities by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Lightning eMotors securities declined significantly as the prior artificial inflation came out of the price of Lightning eMotors securities.

64.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Lightning eMotors' business, prospects and operations.

Defendants' false and misleading statements had the intended effect and caused Lightning eMotors securities to trade at artificially inflated levels throughout the Class Period.  As a result of their purchases of Lightning eMotors securities at artificially inflated prices during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

65.     When the truth about the Company was revealed to the market, the price of Lightning eMotors securities fell significantly.  The decline began to remove the inflation from the price of Lightning eMotors securities, causing real economic loss to investors who had purchased these securities during the Class Period.  The declines in the price of Lightning eMotors securities when the corrective disclosure came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Lightning eMotors securities negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

66.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Lightning eMotors securities and the subsequent significant decline in the value of these securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

67.     At all relevant times, the market for Lightning eMotors securities was an efficient market for the following reasons, among others:

(a)     Lightning eMotors securities met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, Lightning eMotors filed periodic public reports with the SEC and the NYSE;

(c)     Lightning eMotors regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Lightning eMotors was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for Lightning eMotors securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Lightning eMotors securities.   Under these circumstances, all purchasers of Lightning eMotors securities during the Class Period suffered similar injury through their purchase of these securities at artificially inflated prices and a presumption of reliance applies.

69.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or

omissions.   Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects- information that defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

70.     The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lightning eMotors who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the securities of Lightning eMotors during the Class Period.  Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lightning eMotors securities were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lightning eMotors or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and management of Lightning eMotors; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, the defendants named herein disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     These defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Lightning eMotors securities during the Class Period.

80.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lightning eMotors securities.  Plaintiff and the Class would not have purchased Lightning eMotors securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

81.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Lightning eMotors securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Blank Check Sponsor Defendants

82.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

83.     The Individual Defendants and the Blank Check Sponsor Defendants acted as controlling persons of Lightning eMotors within the meaning of § 20(a) of the Exchange Act.

84.     By virtue of their positions as officers and/or directors of Lightning eMotors, and/or their beneficial ownership of Lightning eMotors common stock, the Individual Defendants and the

Blank Check Sponsor Defendants had the power and authority to, and did, cause Lightning eMotors to engage in the wrongful conduct alleged.

85.    In addition to controlling the Company, defendants Katz and Dinu also controlled GigAcquisitions3, GigFounders, and GigCapital Global and utilized these entities to perpetrate the fraudulent scheme and course of business detailed herein, thereby personally enriching themselves.

86.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Lightning eMotors securities during the Class Period.

87.    By reason of such conduct, the defendants named herein are liable pursuant to § 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Designating plaintiff as lead plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as lead counsel;

B.    Awarding plaintiff and other members of the Class damages together with interest thereon;

C.    Awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.    Awarding plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  December 1, 2021                **JOHNSON FISTEL, LLP**


                                                *s/ Jeffrey A. Berens*
                                        Jeffrey A. Berens

                                2373 Central Park Boulevard, Suite 100
                                Denver, CO 80238-2300
                                Telephone: 303.861.1764
                                Facsimile: 303.861.1764
                                jeffb@johnsonfistel.com

                                MICHAEL I. FISTEL
                                40 Powder Springs Street
                                Marietta, GA  30064
                                Telephone: 470.632.6000
                                Facsimile: 770.200.3101
                                michaelf@johnsonfistel.com

                                *Attorneys for Plaintiff*

DocuSign Envelope ID: 858C6BFA-8945-4379-BEDA-0DEC1F0565A5

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I,  Justin Cohen, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 1/15/2021 | 32 | $15.44 |
| 1/29/2021 | 36 | $15.25 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

DocuSign Envelope ID: 858C6BFA-8945-4379-BEDA-0DEC1F0565A5

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 11/23/2021

Justin Cohen