**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-02774-RMR-KLM (consolidated with 1:21-cv-03215-KLM)

JOHNNY R. SHAFER,
JUSTIN COHEN, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

LIGHTNING EMOTORS, INC.,
TIMOTHY R. REESER,
TERESA P. COVINGTON,
GIGACQUISITIONS3 LLC,
GIGCAPITAL GLOBAL,
AVI S. KATZ,
RALUCA DINU
NEIL MIOTTO,
GIGFOUNDERS LLC
BRAD WEIGHTMAN,
ANDREA BETTI-BERUTTO,
PETER WANG,
JOHN J. MIKULSKY, and
ROBERT FENWICK-SMITH,

      Defendants.

---

**PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS**

---

4864-8659-5614.v1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..........................................................................................................2

II.   JURISDICTION AND VENUE ....................................................................................8

III.  PARTIES ......................................................................................................................9

 A.    Plaintiffs..........................................................................................................9

 B.    Defendant Lightning eMotors.................................................................10

 C.    Gig Defendants ..............................................................................................10

 D.    Control Entity Defendants .........................................................................13

 E.    Lightning Defendants....................................................................................15

IV.   FACTUAL BACKGROUND .......................................................................................17

 A.    Blank Check Companies................................................................................17

 B.    The Creation of GigCapital3 and Its IPO .................................................20

 C.    GigCapital3 Identifies Lightning Systems as an Acquisition Target.........23

 D.    Defendants Mislead Investors to Obtain Shareholder Approval of the Business Combination.........................................................................27

 E.    Defendants Conceal the Extent of Lightning Systems' Operational Problems in Advance of the Shareholder Vote...........................................33

 F.    Defendants Successfully Close the Business Combination ......................37

 G.    Lightning eMotors Releases Poor First Quarter Results, But Continues to Deny Operational Issues.......................................................39

 H.    The Truth Is Revealed....................................................................................43

 I.    Lightning's Continued Struggles and Management's Post-Class Period Admissions ........................................................................................44

 J.    Confidential Witness Accounts....................................................................45

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..........................................................................56

 A.    May 13, 2020 Registration Statement........................................................56

**Page**

B.       December 10, 2020 Press Release and Investor Call.................................58

C.       January 4, 2021 Slide Deck ........................................................................61

D.       January 12, 2021 ICR Conference slide deck............................................63

E.       March 26, 2021 Proxy................................................................................64

F.       March 26, 2021 Press Release ...................................................................69

G.       March 31, 2021 Form 10-K .......................................................................71

H.       May 17, 2021 Press Release and Form 10-Q............................................72

I.       June 17, 2021 Analyst Day Presentation ..................................................74

J.       July 8, 2021 Prospectus..............................................................................77

VI.       ADDITIONAL SCIENTER ALLEGATIONS..................................................79

A.       The Individual Defendants' Financial Motives .........................................79

B.       Timing of Revelations Supports Scienter ..................................................82

       1.       Board of Directors Reclassifies Katz's and Dinu's Terms Days After Closing, Then Announces Katz, Dinu, and Miotto Will Not Stand for Re-Election.........................................82

       2.       Lightning Reduces 2021 Guidance Just Weeks After Closing ...........................................................................83

       3.       Lightning Withdraws 2021 Guidance and Announces that Katz, Dinu, and Miotto Will Be Leaving the Board Just Three Months After Closing .......................................................83

C.       The Gig Defendants' Due Diligence and Conversations with Possible PIPE Investors ..............................................................................84

D.       Lightning's Chief Procurement Officer Resigns After Just Two Months on the Job ......................................................................................86

E.       Prior GigCapital SPACs Richly Rewarded the Gig Defendants, But Cost Their Shareholders................................................................................87

**Page**

VII.    LOSS CAUSATION/ECONOMIC LOSS ........................................................................88

VIII.    PRESUMPTION OF RELIANCE....................................................................................90

IX.    NO SAFE HARBOR ........................................................................................................92

X.    CLASS ACTION ALLEGATIONS ................................................................................93

        COUNT I ..........................................................................................................95

        COUNT II .........................................................................................................97

        COUNT III ........................................................................................................98

        COUNT IV ......................................................................................................101

        COUNT V .......................................................................................................102

        COUNT VI ......................................................................................................104

4864-8659-5614.v1

Lead Plaintiffs David P. Sarro, Kevin L. Tye, and Jess Q. Williams (together, "Plaintiffs"),

individually and on behalf of all others similarly situated, by and through their undersigned counsel,

bring this federal class action (the "Action") for violations of:

(i)  Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") on behalf of themselves and other shareholders of Lightning eMotors, excluding Excluded Persons,[1] who purchased or otherwise acquired publicly traded securities issued pursuant to GigCapital3, Inc.'s Form S-1 Registration Statement declared effective on May 5, 2020 with the Securities and Exchange Commission ("SEC"), as amended by Post-Effective Amendment No. 1, filed on May 13, 2020 (the "Registration Statement");

(ii)  Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") on behalf of themselves and other shareholders of GigCapital3, Inc. as of the March 15, 2021 record date (the "Record Date"), excluding Excluded Persons, that were entitled to vote on GigCapital3's proposed transaction (the "Business Combination") to acquire Lightning Systems; and

(iii)  Sections 10(b) and 20(a) of the 1934 Act on behalf of themselves and all other persons, excluding Excluded Persons, that purchased or otherwise acquired Lightning eMotors securities during the period from May 18, 2020 through August 16, 2021 (the "Class Period"), and were damaged thereby.

Plaintiffs' allegations are based upon personal knowledge as to those allegations concerning

themselves and, as to all other matters, upon the investigation of counsel, which included, without

limitation, the review and analysis of: (a) public filings made by Lightning eMotors, Inc. f/k/a

GigCapital3, Inc. ("Lightning eMotors," "Lightning," or the "Company") with the SEC; (b) releases

and other statements issued by Defendants; (c) information provided by former employees of

Lightning Systems and/or the Company; (d) securities analyst reports, securities pricing data, news

---

[1]  The "Excluded Persons" from the Class are (i) Defendants; (ii) the officers and directors of Lightning eMotors at all relevant times, as well as members of their immediate families and their legal representatives, heirs, successors or assigns; (iii) any entity in which Defendants have or had a controlling interest; and (iv) the PIPE Investor and Convertible Note Investors as defined in Lightning eMotors' Form S-1 and incorporated Proxy Statement dated March 26, 2021 filed with the SEC (the "Proxy").

- 1 -

articles, websites, and other publicly available information concerning Defendants and other related non-parties; and (e) public filings in *Delman v. GigAcquisitions3*, *LLC, et al.*, No. 2021-0679 (Del. Ch.), and *Laidlaw v. GigAcquisitions2, LLC, et al.*, No. 2021-821 (Del. Ch.).

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a securities class action brought on behalf of investors in Lightning eMotors securities during the period of May 18, 2020 through August 16, 2021, inclusive (the "Class Period"), against Lightning eMotors, certain of its officers and directors, and the officers, directors, and certain affiliates of the Company's predecessor entity, GigCapital, Inc. ("GigCapital3").

2.    The events giving rise to the claims alleged herein began when GigCapital3, a special purpose acquisition vehicle ("SPAC"), held its initial public offering ("IPO") on May 18, 2020. GigCapital3 was a shell corporation formed by Defendant GigAcquisition3, LLC, at the direction of GigCapital Global and GigFounders LLC (and through such entities, managing partners Drs. Avi S. Katz and Raluca Dinu), with the sole purpose of pooling funds through an IPO in order to acquire or otherwise combine with a late-stage private company.

3.    To say that using SPACs, rather than traditional IPOs, to take companies public was in vogue in 2020 would be an understatement.  In 2019, there were 59 SPAC IPOs, raising $13.6 billion and accounting for 28% of companies brought public.  In 2020, there were 248 SPAC IPOs, collectively accounting for 55% of companies brought public and raising $83.4 billion in gross

proceeds – a more than 500% increase in proceeds year-over-year.  This proliferation meant that investors looking to participate in a SPAC had a wealth of options to choose from.  Because at the time of its IPO, a SPAC has not identified a target to acquire, investors are left to make their investment decision based on the information available about the SPAC itself – namely, who the management team is behind the SPAC, their business experience, investment thesis, and track record in bringing other companies public.

4.      The directors and officers of GigCapital3 attempted to set their SPAC apart by selling investors on what they referred to as their "unique" approach to private equity in the SPAC's registration statement and prospectus filed with the SEC.  Rather than simply completing a business transaction and cashing out their lucrative "initial stockholder shares" – private shares purchased by SPAC sponsors in the SPAC before the IPO for a pittance – the GigCapital3 team would employ a "Mentor-Investor" approach, with a plan to remain engaged with the target company over a period of three-to-five years in order to ensure its success.  The GigCapital3 team would place members of its management on the board of the newly public target company, and its members would use their experience running public companies to help the target company's management develop appropriate strategies and if necessary, acquire additional funding.

5.      Their story worked – GigCapital3 successfully raised $200 million through the sale of securities to investors in its IPO.  Prior to the IPO, SPAC sponsor GigAcquisitions3 (owned by the GigCapital3 management team) purchased more than 5.7 million "founders' shares" of GigCapital3 (approximately 20% of the SPAC) for just $25,000.

6.      On December 10, 2020, GigCapital3 announced that it had reached an agreement to acquire Lightning Systems (then doing business as Lightning eMotors), an electric vehicle and

- 3 -

powertrain manufacturer based in Loveland, Colorado, subject to GigCapital3 investor approval. Once the Business Combination was completed, Lightning Systems would become a wholly owned subsidiary of GigCapital3, GigCapital3 would rename itself Lightning eMotors, and GigCapital3 units, warrants, and common stock – then trading on the New York Stock Exchange ("NYSE") under the symbols "GIK.U," "GIK.WS," and "GIK" – would be relisted as "ZEV.WS" and "ZEV," with the units ("GIK.U") first being broken into their underlying securities.  Accordingly, Lightning Systems would become a publicly traded company without ever having to conduct a traditional IPO.

7.     Defendants sold the deal with Lightning Systems to investors as an ideal match: not only was Lightning Systems' management a good candidate for the "Mentor-Investor" approach supposedly employed by the GigCapital team, but the company itself was on the cusp of massive growth.  With the funding provided by the SPAC acquisition, Lightning Systems was allegedly poised to grow its revenues exponentially, from $9 million in 2020 to $63 million in 2021 (a 600% increase year-over-year) to $354 million in 2022 (a 460% increase year-over-year).  More, the Company's gross margin would supposedly increase more than five-fold, from 3% in 2020 to 19% in 2022.  Defendants assured investors that they had "strong visibility" into these numbers, since Lightning Systems' backlog of contracted orders already covered revenues into 2022.

8.     Defendants continued to sell investors on Lightning Systems' growth story through press releases, investor presentations, and SEC filings until March 26, 2021, when GigCapital3 issued and disseminated the definitive Proxy requesting that eligible shareholders vote to approve the Business Combination with Lightning Systems and, among other proposals, to elect Defendants Katz, Dinu, and Neil Miotto to the new Lightning eMotors board of directors ("Board") for initial terms of three, two, and one years, respectively.  Unbeknownst to investors, Defendants' statements

- 4 -

touting Lightning Systems' positioning for rapid growth, robust supply chain, and operational stability were false and misleading, as were representations that the GigCapital3 team would remain engaged in the post-combination company.

9.      In truth, Lightning Systems was not well-positioned to rapidly scale its operations and its projected financials were unachievable, as Defendants knew or were reckless in not knowing. The Company had only been designing and manufacturing electric vehicles for two years, and did not have the mature supply chain necessary to scale its production at the rate promised.  As a small, cash-constrained company, Lightning Systems was forced to rely on small, lower-tier suppliers for many of its key parts, including the batteries that powered its vehicles.  These suppliers simply didn't have the capacity to move from production of small batches of parts to the hundreds needed for Lightning Systems to achieve the vehicle production quotas or revenue promised to investors. Incomplete vehicles sitting on Lightning's production floor for weeks or even months while waiting for additional parts was already a common sight.  Worse, components shortages that had long afflicted the company got progressively worse through 2020 and into 2021, so that by the time the Proxy was issued, Lightning Systems was already far off track for its 2021 revenue projections.

10.     Based on the false and misleading information contained in the Proxy and earlier solicitation materials, GigCapital3 investors voted to approve the deal.  The Business Combination with Lightning Systems closed on May 6, 2021, and Lightning eMotors securities began trading on the NYSE on May 7, 2021.  On May 11, 2021, just five days after the deal closed, the new Lightning eMotors Board met and elected to reclassify the directorships of Katz (now co-Chairman of the Board) and Dinu, so that like Miotto, they would only serve initial terms of one year on the Board. They would need to run for re-election on October 7, 2021 at the first annual shareholder meeting.

- 5 -

11.     A few days later, on May 17, 2021, Lightning eMotors announced disappointing financial results for the first quarter of 2021, producing only 31 vehicles and one powertrain kit of its projected 500 annual quota and a net loss for the quarter of $27.4 million.  It also revised its financial guidance downward, guiding $50 to $60 million in revenue for 2021 rather than the $63 million reported in the Proxy, an approximate 5-20% revenue reduction.  Lightning management attributed the miss to supply chain "headwinds" in the first quarter, and noted that supply chain shortages would "have a significant impact on short-term margin and operating costs," but still insisted that "Lightning eMotors [was] well-positioned to achieve its 2021 forecast of over 500 purpose-built zero emission commercial vehicles," and well-equipped to handle any further "supply chain unpredictability."  Lightning's management reiterated these sentiments at an "analyst day" on June 17, 2021, once again stating that the Company's "established network" of suppliers and manufacturing partners were "making it easier to scale" and that they felt confident in the latest financial projections.

12.     The truth was revealed on August 16, 2021 when, following market close, Lightning announced dismal second quarter results.  It announced that as a result of "supply chain challenges," it had produced only 37 vehicles and powertrain systems in the second quarter, and earned only $10.5 million during the first half of 2021, with a net loss over the same period of $73.5 million and net loss per share for the quarter of $0.79 (compared to $0.10 in the second quarter of 2020).  The Company's gross margin had also worsened from -16% in the first quarter of 2021 to -19% in the second quarter.  Worse still, the Company announced that it was withdrawing its prior financial guidance for 2021, as it no longer expected to meet the numbers provided, and announced that none of the GigCapital3 team members elected to the Board – Miotto, Dinu, and Katz – would be standing

- 6 -

for re-election.  In other words, within just three months of the closing and amidst significant operational and financial challenges for Lightning, the GigCapital3 team was officially jumping ship and abandoning any pretense of actually employing the "Mentor-Investor" model and three-to-five year engagement they had sold to investors.

13.     Following these disclosures, the artificial inflation caused by Defendants' materially false and misleading statements and omissions left Lightning's securities.  Its stock price dropped from a closing price of $9.63 per share on August 16, 2021 to close at $8 per share on August 17, 2021 – a single-day drop of 17% on unusually high trading volume.  Its warrant price dropped from a close of $1.82 on August 16, 2021, to close at $1.44 per warrant on August 17, 2021, a single-day drop of nearly 21%.

14.     In sum, Defendants, through the creation of the SPAC and affiliated entities and the issuance of numerous false and misleading misrepresentations and omissions of material fact, were able to persuade investors to invest in their SPAC and approve a Business Combination that was not nearly as promising or valuable as represented.  While investors suffered significant damage from the Business Combination and resultant revelation of the true facts surrounding the transaction, Defendants reaped enormous profit.  Lightning obtained approximately $268 million in gross proceeds from the Business Combination; Defendants Reeser and Fenwick-Smith, who had owned significant Lightning Systems equity, now own millions of shares of a publicly traded company with the possibility of earning additional shares pursuant to an "earnout" clause in the merger agreement; Reeser received a six-figure "bonus" to celebrate the closing of the combination, while Fenwick-Smith and Covington each received a significant five-figure "bonus"; within a few weeks of closing, Reeser had his annual salary more than doubled and received large grants of Lightning restricted

- 7 -

stock, with the added benefit of a massive annual bonus structure in the future; and GigAcquisitions3's founder shares, purchased for just $25,000, have made the GigCapital3 management team ***millions***.  As of market close on May 16, 2022, Lightning's stock was worth just $3.94 per share, barely 43% of GigCapital3's $9.05 closing price on April 21, 2021, the day that shareholders approved the merger with Lightning.

## II.   JURISDICTION AND VENUE

15.    The claims asserted herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k, 77o, §§10(b), 14(a) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and SEC Rules 10b-5 and 14a-9, 17 C.F.R. §§240.10b-5, 240.14a-9, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under §22 of the 1933 Act, §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 because this is a civil action arising under the laws of the United States of America.

16.    Venue is proper in this District under 28 U.S.C. §1391(b) because Lightning eMotors maintains its principal executive offices in this District, and many of the acts and practices complained of herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

17.    In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the NYSE, a national securities exchange.

4864-8659-5614.v1

III.     **PARTIES**

A.     **Plaintiffs**

18.     Lead Plaintiff David P. Sarro, individually on behalf of the Sarro Family Revocable Living Trust, purchased GigCapital3 and Lightning eMotors securities during the Class Period that were issued pursuant to the Registration Statement, as set forth in ECF Nos. 31-2, 31-3, and 31-4, incorporated by reference herein, and suffered damages due to Defendants' violations of the federal securities laws alleged herein.  Mr. Sarro held GigCapital3 shares as of the March 15, 2021 Record Date for the Business Combination, and as such was entitled to vote on the Business Combination at the special meeting.

19.     Lead Plaintiff Kevin L. Tye purchased GigCapital3 and Lightning eMotors securities during the Class Period that were issued pursuant to the Registration Statement, as set forth in ECF Nos. 31-2, 31-3, and 31-4, incorporated by reference herein, and suffered damages due to Defendants' violations of the federal securities laws alleged herein.  Mr. Tye held GigCapital3 shares as of the March 15, 2021 Record Date for the Business Combination, and as such was entitled to vote on the Business Combination at the special meeting.

20.     Lead Plaintiff Jess Q. Williams purchased GigCapital3 and Lightning eMotors securities during the Class Period that were issued pursuant to the Registration Statement, as set forth in ECF Nos. 31-2, 31-3, and 31-4, incorporated by reference herein, and suffered damages due to Defendants' violations of the federal securities laws alleged herein.  Mr. Williams held GigCapital3 shares as of the March 15, 2021 Record Date for the Business Combination, and as such was entitled to vote on the Business Combination at the special meeting.

**B.      Defendant Lightning eMotors**

21.      Defendant Lightning eMotors is an electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets.  Lightning eMotors' common stock and warrants trade on the NYSE under the ticker symbols "ZEV" and "ZEV.WS," respectively.   Lightning eMotors is a Delaware corporation with headquarters in Loveland, Colorado.

22.      Prior to the closing of the Business Combination on May 6, 2021, Lightning eMotors was a "blank check" company named GigCapital3, Inc. and its stock, warrants, and ownership units traded on the NYSE under the symbols "GIK," "GIK.WS," and "GIK.U," respectively.

23.      Defendant Lightning eMotors issued the Registration Statement, Proxy, press releases, SEC filings, and held the June 17, 2021 Analyst Day described in §V, *infra*.

**C.      Gig Defendants**

24.      Defendant Avi S. Katz ("Katz") is the founder, manager and with Defendant Dinu, majority owner, of Defendants GigAcquisitions3 and GigFounders LLC, as well as affiliate entity GigManagement LLC.  Prior to the Business Combination, Defendant Katz was CEO, President, and Secretary of GigCapital3.  Katz was also the Chairman of the board of directors of GigCapital3. From the closing of the Business Combination through the October 7, 2021 shareholder meeting, Katz served as co-Chairman of the Lightning eMotors Board.  Through his investment group, Defendant GigCapital Global, of which he is a founding and managing partner, Katz has sponsored at least six blank check companies since 2017.

25.      Defendant Raluca Dinu ("Dinu") is Katz's business partner and wife.  Prior to the Business Combination, Dinu served as a board member of GigCapital3, and she remained on the

Board of Lightning eMotors from the closing of the Business Combination until the October 7, 2021 shareholder meeting.  Like Katz, Dinu is a founding managing partner of Defendant GigCapital Global, a managing member and majority owner of GigFounders LLC, and a managing member of GigManagement LLC.  With Katz, Dinu is a serial sponsor of blank check companies.  Simultaneous with her role at GigCapital3, Dinu served as the CEO of GigCapital2, one of GigCapital Global's other SPACs, and served on the Strategic Advisory Board of Kaleyra, Inc. ("Kaleyra"), formerly GigCapital1.

26.     Defendant Neil Miotto ("Miotto") was a member of GigCapital3's board of directors from its inception in February 2020 through the Business Combination, and continued as a director on the board of Lightning eMotors until October 7, 2021.  Miotto is also a Managing Partner of GigCapital Global, a minority owner of GigFounders LLC and GigManagement LLC, and, per the Proxy, had a "direct or indirect economic interest" in GigAcquisitions3.  Miotto served on the board of directors for both GigCapital1 and GigCapital2, as well as previously serving on the board of Katz-owned company GigPeak from 2008 to April 2017.

27.     Defendant Brad Weightman ("Weightman") was the Chief Financial Officer ("CFO") of GigCapital3 from its inception in February 2020 through the Business Combination, as well as the Vice President and CFO of GigCapital Global.  Weightman received from $5,000 to $15,000 per month for his services as CFO of GigCapital3, as well as 5,000 Insider Shares[2] of GigCapital3.  Per the Proxy, Weightman also had a "direct or indirect economic interest" in GigAcquisitions3.

---

[2]     As defined in the Proxy, "Insider Shares" are shares of Lightning eMotors common stock issued prior to GigCapital3's IPO to Defendants Wang, Betti-Berutto, and Weightman.  "Initial Stockholder Shares" are the 5,893,479 shares of common stock that were issued prior to the GigCapital3 IPO to GigCapital3's directors, officers, Defendant GigAcquisitions3, and GigCapital3's underwriters (Nomura Securities International, Inc., Oppenheimer & Co. Inc., and Odeon Capital Group LLC).

Weightman also served as the CFO of GigCapital Global's other SPACs: GigCapital1, GigCapital2 and GigCapital4.  Weightman was previously the Corporate Controller at Katz's previously owned company, GigPeak, from September 2015 through April 2017.

28.     Defendant John J. Mikulsky ("Mikulsky") was a member of the board of directors of GigCapital3 from February 2020 until the closing of the Business Combination.  Per the Proxy, Mikulsky also had a "direct or indirect economic interest" in GigAcquisitions3.  Mikulsky is a Strategic Advisor at GigCapital Global and served on the board of directors of GigCapital1 and, simultaneously with GigCapital3, GigCapital2.  Mikulsky also sat on the board of directors of Katz-owned GigPeak from June 2011 through April 2017.

29.     Defendant Andrea Betti-Berutto ("Betti-Berutto") was a member of the board of directors of GigCapital3 from February 2020 through the closing of the Business Combination. Betti-Berutto is the Chief Technical Officer, Hardware at GigCapital Global, and per the Proxy, also had a "direct or indirect economic interest" in GigAcquisitions3 and received 5,000 Insider Shares. Betti-Berutto co-founded GigPeak with Katz, and served as the Chief Technology Officer at GigPeak from April 2007 through April 2017.  At the time the Proxy was issued, Betti-Berutto also was involved in two of GigCapital Global's other SPACs, GigCapital2 and GigCapital4, as Chief Technical Officer, Hardware.

30.     Defendant Peter Wang ("Wang") was a member of the GigCapital3 board of directors from February 2020 through closing of the Business Combination.  Wang is the Chief Technical Officer, Software at GigCapital Global and was involved in GigCapital2 at the same time as GigCapital3.  At the time the Proxy was issued, Wang was a member of the Strategic Advisory

- 12 -

Board of Kaleyra, previously known as GigCapital1. Per the Proxy, Wang also had a "direct or indirect economic interest" in GigAcquisitions3.

31. The above-named individual Defendants are collectively referred to herein as the "Gig Defendants." The Gig Defendants were GigCapital3's officers and directors at the time the Registration Statement was issued and when the Proxy was issued. The Proxy was issued by the order of the GigCapital3 board of directors and the board recommended that GigCapital3 shareholders vote for each of the proposals. Each is named in Counts I-VI.

**D. Control Entity Defendants**

32. Defendant GigCapital Global ("GigCapital") describes itself as a "serial SPAC issuer and the first Private-to-Public Equity [] business and technology executive group dedicated to taking late-stage, high quality private TMT companies to the public market" through its "'IPO-in-a-box' methodology." Launched in 2017, according to GigCapital, "[t]he group deploys a unique Mentor-Investor™ methodology to partner with exceptional TMT [technology, media, and telecommunications] companies, managed by dedicated and experienced entrepreneurs." This "Mentor-Investor" methodology was so critical to GigCapital's marketing of its SPACs, including GigCapital3, that GigCapital caused GigFounders to trademark the term "Mentor-Investor." According to GigCapital's marketing materials, it has a "unique approach to the SPAC process" characterized by the following attributes:

- Ongoing support of the company through our Mentor-Investor™ involvement that typically includes providing expert Board of Director participation.

- Leveraging our extensive investment banking relationships to assist the company in subsequent financing activities such as Private Investments in a Public Entity (PIPE), secondary offerings, debt financing, etc.

- • Extensive experience in M&A transactions as a method to rapidly grow the business.

- • Mentorship to senior management as they grow and develop the business and face the inevitable challenges associated with that growth.

- • Through our personal networks providing important introductions to industry leaders and executives on a worldwide basis, as well as investment banks, research analysts, institutional investors and debt landers."[3]

33.   GigCapital describes its process as following the timeline below:



*Source: GigCapital presentation to ICR Conference, Winter 2021, filed with the SEC pursuant to Rule 425 under the 1933 Act on January 12, 2021.*

34.   At the direction of Katz and Dinu, GigCapital established GigFounders LLC,

GigAcquisitions3 and GigCapital3 to effectuate the fraudulent scheme alleged herein.

---

[3]   GigCapital™, "The Special Purpose Acquisition Company (SPAC) or Private to Public Equity (PPE) ™ Initiative," *available at* https://www.gigcapitalglobal.com/resource/the-special-purpose-acquisition-company-spac-or-private-to-public-equity-ppetm-initiative/.

35.     Defendant GigFounders LLC ("GigFounders") is an entity owned and controlled by Defendants Katz and Dinu, with a minority financial interest held by Defendant Miotto.  At the direction of Katz and Dinu, GigFounders created GigAcquisitions3, and entered into an agreement for general administrative services and office space with GigCapital3 for $20,000 per month to last from GigCapital3's IPO through the closing of the Business Combination.

36.     Defendant GigAcquisitions3, LLC ("GigAcquisitions3") served as the blank check sponsor of GigCapital3, and was founded by Defendant GigFounders LLC.  Defendant Katz beneficially owned all shares of GigAcquisitions3, although GigCapital3 directors Dinu, Miotto, Mikulsky, Betti-Berutto, Wang, and Weightman also had financial interests in GigAcquisitions3.

37.     Defendants GigCapital, GigFounders, and GigAcquisitions3 are collectively referred to herein as the "Control Entity Defendants."  Each of the Control Entity Defendants is named in Counts II, IV and VI herein.

### E.     Lightning Defendants

38.     Defendant Timothy R. Reeser ("Reeser") is a co-founder of Lightning Systems and served as the Company's President and Chief Executive Officer ("CEO") from October 2012 through the Business Combination.  Following the completion of the Business Combination, Reeser remained CEO of Lightning eMotors and also became a member of Lightning eMotors' Board.  Reeser is also a Managing Partner of Aravaipa Ventures, a clean-tech venture capital firm founded by Defendant Robert Fenwick-Smith, and has a financial interest in the investments made by the firm.  According to the Proxy, Reeser was "the source of many, if not most, of the ideas and execution driving Lightning Systems."  Reeser has a B.S. in Mechanical Engineering from Colorado

- 15 -

State University, and from January 2009 through October 2012 served as the vice president of CSU Ventures, the university's clean-energy supercluster.

39.     Defendant Robert Fenwick-Smith ("Fenwick-Smith") served as the Chairman of Lightning Systems' board of directors since 2010, and was Lightning Systems' Executive Chairman at the time the Proxy was issued. Fenwick-Smith served as Lightning Systems' interim CFO from February through December 2020. Following the closing of the Business Combination, Fenwick-Smith became co-Chairman of the Lightning eMotors Board. Fenwick-Smith spent 20 years in private equity prior to founding Aravaipa Ventures, a venture capital firm with significant investment in Lightning Systems, in January 2008. During the Class Period, Fenwick-Smith was, and continues to be, Senior Managing Director of Aravaipa Ventures. Following the Business Combination, Aravaipa Ventures owned approximately 6.3% of Lightning eMotors' outstanding common stock.

40.     Defendant Teresa P. Covington ("Covington") has served as Lightning Systems' Senior Vice President and CFO since January 4, 2021 and remained Lightning's CFO following the Business Combination. Covington has an M.B.A. from Stanford University, an M.S. in electrical engineering from the University of Southern California, and a B.S. in electrical engineering from the University of Illinois at Urbana-Champaign.

41.     Together, individual Defendants Reeser, Fenwick-Smith and Covington are referred to as the "Lightning Defendants." Each of these individuals was responsible for and had control over statements issued regarding Lightning Systems in the Proxy, and about Lightning eMotors following the Business Combination. The Lightning Defendants are named in Counts IV-VI.

- 16 -

4864-8659-5614.v1

## IV.     FACTUAL BACKGROUND

### A.     Blank Check Companies

42.     A "blank check" company is a company that has no specific established business plan or purpose but has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity, or person.

43.     One type of "blank check" company is a "special purpose acquisition company," or "SPAC."  A SPAC is a publicly traded company created specifically to pool funds through an IPO for the purpose of completing an acquisition or other business combination with an existing company.  Since 2014, there has been a resurgent interest in SPAC IPOs.  In 2020 and 2021, 248 and 613 SPACs were brought to market, raising over $83 billion and $160 billion in total funds, respectively.

44.     Accordingly, investors like Plaintiffs, who were evaluating possible SPAC investment vehicles in 2020 and 2021, had a wide range of SPACs to choose from.  Because SPACs do not identify a target company at the time they conduct their IPO (and often not for months afterward), it is well-recognized that investors heavily rely on the reputation, expertise, experience and specified investment thesis of the SPAC management in evaluating whether to invest in a particular SPAC.[4]

---

[4]     *See, e.g.*, SEC, "What You Need to Know About SPACs – Updated Investor Bulletin," *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin ("If you invest in a SPAC at the IPO stage, you are relying on the management team that formed the SPAC, often referred to as the sponsor(s), as the SPAC looks to acquire or combine with an operating company."); Fangzhou Lu, et al., "SPAC IPOs and Sponsor Network Centrality," Harvard Law School Forum on Corporate Governance (July 20 2021), *available at* https://corpgov.law.harvard.edu/2021/07/20/spac-ipos-and-sponsor-network-centrality/ (noting that "[s]ince the identity of the merged firm is not known prior to the IPO, and there is little other advance information, investors must place their trust in SPAC sponsors" and finding evidence that

- 17 -

45.     In order to create a SPAC, founders – typically a group of private equity investors or a company formed by private equity investors – must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file IPO documentation, and pre-market the investment offering to interested investors.  A target company cannot be identified before the SPAC IPO is completed.  Once capital is raised through the IPO, at least 90% of the proceeds must be deposited into a trust account.  An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.  NYSE rules dictate that the initial business combination must be with one or more target businesses that together have a fair market value equal to 80% of the net assets in the SPAC trust account at the time a definitive agreement with the target is signed.  Although the only purpose of a SPAC is to acquire a target company, SPACs generally have corporate governance structures similar to other operating companies, including officers and a board of directors.

46.     Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team.  Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination.  Because target companies are private entities wishing to go public, they generally have not published prior financial information.  Investors in SPACs accordingly must depend on management to honestly provide accurate information about any contemplated

---

higher quality sponsors "are better at sourcing and picking target firms to work with," and "have a positive impact on the firms after the merger").

transactions in their proxy solicitation materials.  In anticipation of the shareholder vote, each SPAC shareholder has several options.  For example, GigCapital3 shareholders entitled to vote on the Business Combination with Lightning Systems could not only vote for or against the transaction, they could also decide whether to (i) sell their shares in the open market prior to the Business Combination closing; (ii) redeem their shares for a pro rata share of the SPAC trust account upon the closing of the Business Combination; or (iii) hold their shares through the closing and have their shares exchanged for shares of the new Lightning eMotors.

47.     If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of SPAC securities. However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved and the money held in trust is returned to investors.   Accordingly,  the  founders  and  management  team  of  a  SPAC,  who  typically  own approximately 20% of the company through initial stockholder shares and who invest significant resources  both  in  the  formation  of  the  SPAC  and  identifying  acquisition  targets,  are  highly incentivized to get a qualifying transaction approved within the operating deadline.

48.     Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised *no matter what* so that they can collect fees and pay themselves in salary and stock options at the company they purchase – even if the company doesn't perform to stated expectations.  As SEC Chairman Gary Gensler recently stated, "'[SPACs] have on average been pretty costly and not performed up to the marketing. . . .  There's an awful lot

of fees in here for the sponsors. There's an awful lot of fees for bankers and lawyers as well.'"[5]  In addition to the reward of paying themselves a handsome salary, and obtaining shares of the SPAC for a pittance prior to the SPAC IPO, SPAC management teams are incentivized to not waste the significant time and financial resources they expended upfront on legal and financial advisors to set up the investment vehicle.

49.     As set forth herein, Lightning eMotors exemplifies the problem with SPACs. The Defendants here were incentivized to, and did, consummate the Business Combination even though it was not in the best interests of public investors, to whom they made material misstatements and omissions about Lightning Systems and the Gig Defendants' intentions to remain involved with the Company post-Business Combination.

## B.     The Creation of GigCapital3 and Its IPO

50.     GigCapital3 was formed on February 3, 2020 by its sponsor, GigAcquisitions3, and filed a Form S-1 registration statement with the SEC on February 25, 2020. GigAcquisitions3 purchased 5,735,000 shares of GigCapital3 stock for an aggregate purchase price of $25,000,[6] or $0.0044 per share, in a February 2020 private placement transaction. This was followed by additional private awards of 5,000 shares to each of Weightman, Betti-Berutto, and Wang, and a private placement of 650,000 units to GigAcquisitions3 and 243,479 units to GigCapital3's underwriters. All of the securities (including the units' underlying securities) that were issued in

---

[5]     Kiernan, Paul, "SEC Proposes New Disclosure Requirements for SPACs," *The Wall Street Journal* (Mar. 30, 2022), *available at* https://www.wsj.com/articles/sec-considers-new-disclosure-rules-for-spacs-11648654298.

[6]     750,000 shares of this stock were later forfeited due to the over-allotment option not being exercised by GigCapital3's underwriters.

private placement transactions were subject to "lock-up agreements" – agreements that restrict the transfer of any of the securities until a certain date.  Here, the lock-up agreements in relevant part precluded the transfer or sale of any of the private placement shares until (i) 12 months after the date an initial business combination closed, or (ii) following completion of an initial business combination, the date on which the last sale price of the stock equaled or exceeded $12.50 per share. They precluded the transfer of any of the private placement units or securities underlying such units until 30 days after completion of an initial business combination.

51.     Following several revisions to the Form S-1 in response to SEC comments, on May 5, 2020, the SEC declared GigCapital3's Form S-1 effective.  GigCapital3 filed a post-effective amendment to its Form S-1 on May 12, 2020, which was declared effective and became the operative Registration Statement on May 13, 2020.  The Registration Statement provided for the issuance and registration of 23,000,000 units, each consisting of (i) one share of common stock ("shares"), and (ii) three-fourths of one redeemable warrant to purchase one share of common stock ("warrants").  In addition, the Registration Statement registered the 23,000,000 shares of common stock and 17,250,000 warrants that were included as part of the units.

52.     The Class Period begins on May 18, 2020, when GigCapital3 held its IPO, selling 20,000,000 units to investors at $10 per unit for gross proceeds of $200 million.  The units were listed on the NYSE under the ticker symbol GIK.U.[7]  While GigCapital3 did not identify any target companies at the time of the IPO, the IPO offering materials (including the prospectus filed with the Registration Statement) stated that GigCapital3 planned to pursue an acquisition focused in the

---

[7]     On June 29, 2020, GigCapital3 announced that the holders of units could begin to separately trade the securities underlying each of the units starting July 2, 2020.  On July 2, 2020, trading on the NYSE split into units (GIK.U), common shares (GIK), and warrants (GIK.WS).

technology, media, and telecommunications ("TMT") industry.  The IPO offering materials claimed that GigCapital3's management team – the Gig Defendants – had a "distinctive background and record of acquisition and operational success [that] could have a significant impact on target businesses," and the management team's "significant hands-on experience helping TMT companies" would "optimize their existing and new growth initiatives."  The IPO offering materials also stated that utilizing the management team's "extensive experience" and "network of contacts" would "enhance stockholder value."

53.     The Registration Statement and incorporated prospectus provided "Business Combination Criteria" that GigCapital3 would purportedly use to evaluate target companies.  In particular, the Gig Defendants represented that "*[w]e are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon* with a goal of reaching an enterprise value of over $1 billion."[8]  These criteria included the following:

- "*Companies that embrace today's digital transformation and experience . . .* will focus on sustainable technology companies that can shape a better society and healthier environment.

- *Companies that will benefit from being a public listing . . .* and that will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- *Companies that will benefit from our industry expertise and relationships. . . .*

- *Companies that are market-leading participants.*  We will seek a target that has an established business and market position. . . .

- *Companies that are small and mid-sized businesses . . .* [that] will maximize the benefits of the collective network of our management team and its affiliates.

---

[8]     Emphasis added unless otherwise noted.

- *Companies with strong management* . . . that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors."

54.     Pursuant to the prospectus, GigCapital3 was also required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds and to complete that transaction within 18 months of the May 2020 IPO.  In the event GigCapital3 did not complete an initial business combination, it was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a business combination would no longer be economically feasible.

### C.     GigCapital3 Identifies Lightning Systems as an Acquisition Target

55.     According to the Proxy, following GigCapital3's IPO, Katz, Dinu, and GigCapital3's other board members "actively searched for and brought business combination targets" to the board's attention.[9]  The Company stated that it "reviewed more than 10 acquisition opportunities and entered into discussions with more than 10 potential target businesses."  On August 23, 2020, representatives of Bank of America ("BofA") Securities contacted Defendants Dinu and Katz regarding an unnamed acquisition target in the automotive technology sector.  A week later, BofA Securities emailed Katz and Dinu an investment presentation "identif[ying] the potential acquisition target as Lightning Systems," to which BofA Securities acted as financial advisor.  GigCapital3 management virtually met with Lightning Systems management on August 31, 2020, and each side

---

[9]     The GigCapital3 management team also paid themselves substantial salaries for their part-time "advisory" efforts, with Katz and Dinu each receiving $30,000, Miotto and Betti-Berutto each receiving $15,000, and Wang and Mikulsky each receiving $6,000 per quarter.

- 23 -

made investment and marketing presentations to the other.  By September 23, 2020, the parties had executed a letter of intent for GigCapital3 to acquire Lightning Systems.

56.    Lightning Systems was founded in October 2008 by Defendant Reeser.  Although the company originally focused on designing and manufacturing hydraulic hybrid systems for heavy vehicles, since fall of 2017, Lightning Systems had focused exclusively on the design and manufacture of zero-emission all-electric powertrains[10] for medium- and heavy-duty vehicles, including Class 3 cargo and passenger vans and ambulances, Class 4 and Class 5 cargo vans and shuttle buses, Class 6 work trucks and school buses, Class 7 city buses, and Class A motorcoaches, along with charging and ancillary services.



*Source: Lightning eMotors, Inc. June 17, 2021 Form 8-K.*

---

[10]   A vehicle's powertrain is the assembly of parts responsible for generating, converting, and consuming energy and turning that energy into movement.  It includes the engine, transmission, driveshaft, axles and differentials.

57.     Lightning Systems' targeted customers were commercial fleet operators looking to go green, whether for financial, environmental, or regulatory reasons.  Customers could choose to either retrofit their existing vehicles by purchasing and installing Lightning Systems' electric powertrain kit, or could order complete vehicles from Lightning Systems.  In the second instance, Lightning Systems did not build each vehicle from scratch.  Rather, Lightning Systems would purchase vehicles from Original Equipment Manufacturers ("OEMs") like Ford and General Motors and remove the components that made the vehicles gas-powered (*e.g.*, the drivetrain and gas tank), a process referred to internally as "de-comping."  Lightning Systems employees would then put the vehicles back together with an electric system instead.  Approximately 96% of Lightning Systems' 2020 revenue came from the sales of complete electric vehicles, while 4% came from repowering or retrofitting customers' existing vehicles.[11]

58.     On December 10, 2020, GigCapital3 issued a press release announcing that it had entered into an agreement to acquire Lightning Systems for a pro forma equity value of $823 million at $10.00 per share, to be funded by cash from the IPO, the issuance of $539 million in new common stock of GigCapital3 to current holders of Lightning Systems equity, and $125 million from a private placement of newly issued equity and convertible notes (later disclosed to consist of $25 million of gross proceeds from a private placement of newly issued shares to the PIPE Investor, BP Technology Ventures, Inc., and $100 million in convertible notes due in 2024).

59.     The Business Combination was to be structured as a reverse merger:  GigCapital3 formed a wholly owned subsidiary, Project Power Merger Sub, Inc., that would merge with

---

[11]   In June 2021, Lightning estimated that new complete vehicles would represent 80% of its revenue, repowered vehicles would be 10%, and the sale of higher margin electric powertrain kits to OEMs would be 10%.

Lightning Systems.  Lightning Systems would be the surviving business entity from the merger, becoming a wholly owned subsidiary of GigCapital3.  GigCapital3 would then change its name to Lightning eMotors, and its securities would be listed on the NYSE under the ticker symbols "ZEV" and "ZEV.WS."  Owners of GigCapital3 securities would have their shares or warrants exchanged for Lightning eMotors securities, and owners of GigCapital3 units would have their securities broken into their constituent parts (*i.e.*, one share of common stock and three-fourths of one warrant) and exchanged for Lightning eMotors securities as well.

60.     Following the Business Combination, holders of Lightning Systems' privately held securities were expected to hold approximately 66% of the issued and outstanding shares of common stock of the new Lightning eMotors, while GigCapital3's public investors would hold 24%, the PIPE investor would hold 3%, and GigAcquisitions3 would own approximately 7%.  Upon completion of the Business Combination, Defendants Fenwick-Smith and Katz would become the co-Chairmen of Lightning eMotors' Board.  GigCapital3's current directors would resign, with the exception of Defendants Miotto, Katz, and Dinu, who would stay on as directors of Lightning eMotors. Defendant Reeser, Thaddeus Senko, Meghan Sharp, Diana Tremblay and Bruce Coventry would join the Board of Lightning eMotors.

61.     The Business Combination would only be completed if it gained shareholder approval at a Special Meeting of GigCapital3 shareholders to be held on April 21, 2021.  All shareholders of record at the close of business on the March 15, 2021 Record Date were entitled to vote on the issues presented, including whether to approve the merger and who would be elected to the new Lightning eMotors Board, at the Special Meeting.

**D.      Defendants Mislead Investors to Obtain Shareholder Approval of the Business Combination**

62.      In order to sell GigCapital3 shareholders on the Business Combination, Defendants issued false and misleading statements that portrayed Lightning Systems as a company on the cusp of greatness.

63.      The December 10, 2020 press release described Lightning Systems as a "leading innovator" in the U.S. commercial electric vehicle market and a "high-growth electric vehicle manufacturer." It stated that Lightning Systems was experiencing tremendous growth, currently had production capacity of 1,000 vehicles per year, and was on track to reach annual production capacity of 20,000 medium-duty commercial electric vehicles by 2025. Not only did Defendants tell investors that Lightning Systems was poised for exponential growth, but they assured investors that they could feel comfortable with the revenue projections because Lightning Systems purportedly had "strong visibility" into its future revenue. The press release touted that "100% of [Lightning Systems'] projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million is under firm purchase orders as of today, and strong line of sight to $2 billion in projected 2025 revenue, including $1 billion from existing fleet customers."

64.      In an investor conference call presentation later that day, Defendant Dinu told investors that "[t]he company has superior technology, the largest manufacturing facility for electric commercial vehicles in the US, excellent leadership, and critically from a market perspective, the best revenue visibility," and that "Lightning enjoys dominant market positioning with a robust backlog of contracts, *which will enable the company to quickly scale revenues*." In that same presentation, Reeser told investors, "[t]hose orders and those customers that we've already earned provide a great deal of insight into our projected revenue of $2 billion for 2025, and *provide strong*

- 27 -

*visibility over the next five years and to where that revenue comes from and what it is*, with contracted orders that we already have in place today."

65.     Defendants also represented that they had the operational pieces in place necessary for their projected explosive growth.  In the December 10, 2020 investor presentation, Lightning Systems Chief Operating Officer ("COO") Bill Kelley ("Kelley") informed investors that a "very important part of scaling the business is to have a very strong foundation of partnerships," including "on the supply chain side, which is very, very critical."  Luckily, according to Fenwick-Smith later in the presentation, Lightning Systems had "*already built relationships with the suppliers*."

66.     On March 26, 2021, GigCapital3's operative Proxy seeking shareholder support for the Business Combination was declared effective by the SEC.  In a press release issued that day, Dinu advocated for the Business Combination and reiterated that the GigCapital team would remain involved following closing: "'The GigCapital team stays true to our Mentor Investor mission partnering with the exceptional management team of Lightning eMotors *through the IPO and beyond, as we continue to build together a solid company to last* . . . .'"  Reeser also spoke in favor of the Business Combination, noting that "'Lightning eMotors has *maintained remarkable momentum since we announced the proposed business combination in December*,'" and had "'bolstered [its] management team, making several key hires, all of whom have deep industry experience and an engineering background.'"

67.     The Proxy issued to shareholders that day presented the GigCapital3 board's unanimous recommendation that GigCapital3's shareholders vote in favor of the Business Combination, and stated that Lightning Systems satisfied the acquisition criteria outlined in the IPO offering materials.  The Proxy represented that "the Company's Board of Directors conducted

- 28 -

significant due diligence on Lightning Systems" and had "concluded that its members' collective experience and backgrounds, together with the experience and sector expertise of the Company's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination, *including that the Business Combination was fair from a financial perspective to its stockholders*."

68.     The Proxy also repeatedly emphasized that the GigCapital team would remain involved in the new Lightning eMotors following the Business Combination.  For example, it stated that upon completion of the Business Combination, Katz would become a Class III director and the co-Chairman of the Lightning eMotors Board with a term of three years, while Dinu and Miotto would also become directors, with terms of two years and one year respectively, all eligible for election to subsequent three-year terms.  Miotto's addition as co-chairman of the audit committee in particular was intended to reassure GigCapital3 investors that Lightning eMotors would have proper corporate governance and financial reliability going forward.  Miotto's inclusion was purportedly a direct result of Lightning Systems informing GigCapital3 in mid-November 2020, weeks prior to the merger announcement, that it would need to make downward revisions to the financial projections it had previously provided.  The Gig Defendants supposedly ensured that the set of revised financial projections disseminated to investors was correct and reliable, and then insisted that Miotto be included on the new Lightning eMotors Board.  The Proxy also reiterated that the new Lightning eMotors would benefit from the Gig Defendants' experience.  For example, the Proxy stated the Gig Defendants' opinion that Lightning Systems was an appropriate acquisition target because:

> Notwithstanding the significant progress that Lightning Systems had made in developing itself as a market leader . . . it is still a relatively small company, with 93 employees and 43 contractors as of December 31, 2020, with substantial growth

opportunity in front of it that we believe can benefit from our Mentor-Investment approach.

More, the Proxy stated that the Gig Defendants would, "through our Mentor-Investment approach . . . [,] be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation," in particular by helping Lightning Systems "pursue acquisitions as a means to accelerate its growth plans or augment its internal product and service development."

69.     The Proxy focused heavily on Lightning Systems' anticipated growth, stating that it was on track to achieve $63 million in revenue in 2021 with a 14% gross profit margin, and $354 million in 2022 with a 19% gross profit margin, providing the following chart of financial results and growth trends, which were purportedly based on GigCapital3 management's due diligence, and had already been revised once for accuracy:

**Lightning Systems Key Financials**

| ($ in million, unless otherwise noted) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $ 9 | $ 63 | $354 | $640 | $1,165 | $2,012 |
| *Gross Growth* | *NM* | *NM* | *462%* | *81 %* | *82 %* | *73 %* |
| Gross Profit | $ 0 | $ 9 | $68 | $140 | $296 | $528 |
| *Gross Margin* | *3 %* | *14 %* | *19 %* | *22 %* | *25 %* | *26 %* |
| Adjusted EBITDA | ($11 ) | ($17 ) | $15 | $50 | $155 | $315 |
| *Adjusted EBITDA Margin* | *(122%)* | *(27%)* | *4 %* | *8 %* | *13 %* | *16 %* |

70.     The Proxy also reiterated that Lightning Systems had strong visibility into its revenue projections, assuring investors that the projections were "backed by existing customer contracts" that "completely cover[ed]" estimated 2021 revenue and "over 25% of 2022 revenue."  And, although the projections were purportedly made as of November 29, 2020, the Proxy was issued less than a week before Lightning Systems completed its first financial quarter of 2021 ("1Q21").  Investors could therefore reasonably expect that the projections aligned with recent performance.

- 30 -

71.     The Proxy also represented that Lightning Systems' "Capital Light and Cost Effective Business Model" was a basis for the Gig Defendants' recommendation that investors vote "For" the Business Combination, and that Lightning Systems' supply chain relationships were the key to that cost efficiency.  According to the Gig Defendants, "Lightning Systems' relationships with its suppliers are instrumental to the performance and reliability of its vehicles and have enabled it to scale in a relatively asset light and cost-effective manner."

72.     Elsewhere, the Proxy also represented to investors that Lightning Systems had "built an *extensive ecosystem of supply-chain partners* and specialty vehicle partners which are instrumental to our growth," that the supply chain was "*optimized for quality, reliability, and cost*" and that "[b]ecause we have relationships with multiple suppliers for each core component of our vehicles, *we are able to build and maintain a high degree of resilience in our supply chain*, which will assist us with mitigating delays."  According to the Proxy, Lightning Systems' "long-term relationships with supply chain partners [that] have prepared us to scale in a cost effective manner" were key competitive advantages, and "through careful supply chain management and the cultivation of long-term relationships with our suppliers," Lightning Systems would be able to "reduce [its] cost-of-goods-sold by up to 50% over the next 18 months."

73.     The Gig Defendants recommended in the Proxy that shareholders vote "For" the Business Combination – and the issuance of up to 70.4 million new shares of GigCapital3 needed to consummate the transaction – based, in part, on the above financial projections, the purported strengths and scalability of Lightning Systems' operations, and the management expertise that Katz, Dinu, and Miotto would continue to provide to the newly public company.  These representations were used to induce GigCapital3 shareholders to vote in favor of the Business Combination and, in

- 31 -

the case of many shareholders, to forgo redeeming their shares on the promise of the growth Lightning eMotors would soon experience.

74.     Financial analysts were also taken in by the false rosy picture.  For example, Benchmark's initiating report gave GigCapital3 a "Buy" recommendation at a price target of $17 per share.  In reaching that valuation, Benchmark highlighted Lightning Systems' purchase orders, stating "[o]rders support growth: On year-end 2020 Lightning [Systems] had $169 million of backlog up from $27 million at year-end 2019" and "[t]he [purchase] orders cover 100% of the company's expected 2021 revenue of $63 million and over 25% of targeted 2022 revenue of $354 million."

75.     Northland Capital Markets also initiated coverage of the Company at an outperform rating with a $15 price target, noting that Northland did not "believe there is risk to ZEV's sales target this year" owing to the "contracted orders of $150mm, which will cover [Northland's] 2021 revenue forecast of $62mm and one-third of [Northland's] 2022 forecast of $355mm.  The order backlog is 1,500 vehicles, which compares to deliveries of 78 units last year."  Based on Lightning Systems' statements, Northland also estimated shipment of 600 units in 2021 in part because of the company's supposed ability to "minimize supply chain disruptions."  In an industry update issued the week of the shareholder vote, Northland also noted that with regard to the supply chain, "[t]he struggle is real but [Lightning Systems] is relatively prepared" adding that "[t]he struggle for parts is real with long-lead times (except for chargers).  *Lightning [Systems'] business model is relatively insulated*."

76.     Colliers Securities likewise issued a "Buy" rating with a price target of $14 emphasizing that "*Lightning [Systems] has already set itself up with a relatively robust, flexible*

*supply-chain infrastructure* vs. EV peers, and while costs may remain elevated, our discussions with management suggest that *the 2021 order book will be fully built*." Colliers added that "[n]ear-term outlook appears better than most. Lightning Systems has not seen much thus far with respect to insurmountable supply-chain challenges. *The company has adequately planned ahead with alternative suppliers, flexible build schedules, and advance orders*" "with its entire 2021E production accounted for with real purchase orders." With respect to the supply chain issues, Lightning Systems told Colliers that "[Lightning eMotors] *feels confident it can build its 2021 backlog*" despite the supply-chain issues that "are affecting the entire industry" which left Colliers with the impression that Lightning Systems "appear[ed] *poised to deliver on its near-term promises*."

   E.   **Defendants Conceal the Extent of Lightning Systems' Operational Problems in Advance of the Shareholder Vote**

77.   Contrary to Defendants' representations in the Proxy, Lightning Systems' financial projections for 2021 were unrealistic and unachievable, a fact that Defendants knew or were reckless in not knowing at the time the Proxy was issued. In truth, Lightning Systems was facing a series of operational challenges that would hinder its efforts to ramp up production and accordingly, its revenue growth, particularly in the supply-constrained circumstances of the automotive industry during the COVID-19 pandemic.

78.   For any manufacturer, revenue is dependent on being able to get the necessary components to fully assemble its products. Accordingly, whether a company has a reliable supply chain is a key consideration for investors looking at manufacturers. When that manufacturer, like Lightning Systems, is in a relatively new and technology-based industry, market focus on supply considerations is even sharper. Defendants, in touting Lightning Systems' "extensive ecosystem" of

- 33 -

supply-chain partners that was "optimized" for "quality, reliability, and cost," assured investors that Lightning had the means to earn the revenue it projected.  After all, revenue could only be recognized by Lightning Systems after its completed vehicles or powertrains were shipped to customers.

79.     Unfortunately, at the time that Defendants made such statements, Lightning Systems' supply chain was far less extensive, mature, and resilient than represented.  Indeed, immediately before the Business Combination was announced and months after the Gig Defendants' due diligence on Lightning Systems had purportedly begun, Lightning Systems was still in the process of vetting suppliers and figuring out which parts it needed to order to build its vehicles and ensure reliability.

80.     Since switching its focus from hydraulic hybrid vehicles to solely electric vehicles at the end of 2017, Lightning Systems had struggled with supply chain issues, particularly with respect to batteries.  Larger battery suppliers did not want to work with the company since it did not have enough business to place large orders.  Consequently, Lightning Systems had to work with smaller, less-established suppliers like eMatrix Energy Systems ("eMatrix"), that typically could only produce four to seven batteries per week and so had less capacity to handle large or time-sensitive orders.  Some of the batteries Lightning Systems received from these suppliers did not work well and caused Lightning Systems-produced vehicles to shut down or operate at a reduced capacity.  Lightning Systems service technicians were frequently called to swap out battery packs in vehicles that had been shipped to customers but were not functioning reliably.

81.     Having a limited choice of supply partners also meant that Lightning Systems' supply chain for certain key components was concentrated, increasing its operational risk.  In the year

ending 2020, one supplier accounted for a full 33% of Lightning Systems' inventory, while another represented 12% of the company's accounts payable.



*Source: Lightning eMotors June 17, 2021 Analyst Day presentation, filed on June 17, 2021 with the SEC on Form 10-K.*

A problem or delay experienced by any single supplier could (and often did) negatively impact which and how many vehicles Lightning Systems could complete, and thus result in decreased revenue.

82.    The supply chain issues that had always plagued Lightning Systems got progressively worse through 2020 and 1Q21.  Shortages of key components even led Lightning Systems to make a significant design change in its vehicles in order to be able to build more.  By early 2021, sensitive to the fact that investors would be focused on their unit production growth, Lightning Systems was often shipping vehicles to customers with inferior components, intending to have their service technicians "retrofit" the vehicles in the field at a later date once they could source the right parts.

- 35 -

Lightning's management also directed employees to fulfill orders based on the parts they had available, with an eye toward maximizing the quantity of vehicles shipped, rather than based on when orders were placed. For example, because certain of Lightning Systems' vehicles only required one battery, while others required two or three, employees were directed to prioritize orders of vehicles requiring only one battery first, so that more could be shipped and the company's operations would appear more stable. Meanwhile, partially built vehicles that other customers had ordered remained sitting on Lightning Systems' factory floor for weeks or even months until the necessary parts became available. Supply shortages and their impacts on production quotas were frequently discussed at weekly or twice-weekly meetings on the production floor between Reeser, Kelley, Director of Supply Chain & Operations Brandon McNeil ("McNeil"), and production floor supervisors.

83. In addition to having an immature supply chain, Lightning Systems also struggled with the reliability of its vehicles, which, according to one former technician, suffered a failure rate of approximately 40% to 50% and sometimes required repairs just a few days after delivery to end-users. For example, although in December 2020, Lightning Systems bragged to the market that tech-savvy delivery-giant Amazon was a customer, internally it was well-known that Amazon had merely purchased 15 delivery vans for an initial pilot program in San Diego, to evaluate whether Lightning Systems vehicles would be suitable for further fleet purchases of up to 100 vans. Worse still, Amazon was very dissatisfied with the reliability and need for frequent repair of the vans Lightning Systems had produced for its use throughout the pilot program. The Lightning Systems technicians working on the Amazon account were concerned about the safety of the vans throughout the pilot program as well, believing they had been rushed out the door prematurely and without adequate

testing (and had told Lightning Systems' Director of Engineering as much).  As a result of the unsuccessful pilot program, Amazon actually had elected not to order any further vehicles from Lightning Systems by the end of 2020, shelving what had promised to be a multi-million-dollar order, and ultimately ordered 100,000 delivery vehicles from another EV producer.

84.     Vehicle and powertrain "unit" quotas were all-important to Lightning Systems management, who wanted to demonstrate the company's ability to grow revenue rapidly in order to attract investment, both before and following the Business Combination.  Engineers and production floor employees were pressured to send vehicles to customers knowing that they still had bugs or otherwise had not been adequately tested, such that the vehicles would sometimes require service just days after the customer received them.  More, because Lightning Systems tended to hire and lay off employees as orders came in or were cancelled, it often lacked the necessary experienced staff to manufacture its vehicles safely, a problem compounded by a lack of standardized operation procedures used in various workstreams, including by manufacturing and technicians.  Management pressure to meet quotas led to 70-hour weeks for employees, and following a large round of layoffs in spring 2020 and further employee attrition, at the time the Proxy was issued, Lightning Systems simply did not have the trained staff needed to rapidly scale operations to meet its stated 2021 production projections.

### F.      Defendants Successfully Close the Business Combination

85.     Relying on Defendants' misleading impression of Lightning Systems provided in the Proxy, GigCapital3 shareholders voted in favor of the transaction at a special shareholders' meeting on April 21, 2021.  The Business Combination closed on May 6, 2021, at which time GigCapital3 changed its name to Lightning eMotors.  Defendants Katz and Weightman resigned as executive

officers of GigCapital3 as planned, and Betti-Berutto, Mikulsky, and Wang resigned from the GigCapital3 board.  Katz became a Class III director and co-Chairman of the Lightning eMotors Board with a three-year initial term, Dinu a Class II director with a two-year initial term, and Miotto a Class I director with a one-year initial term.

86.     On May 7, 2021, the Company's common stock and warrants began trading on the NYSE under the symbols "ZEV" and "ZEV.WS," respectively.  Holders of approximately 70% of outstanding shares elected not to redeem their shares, but to continue holding Lightning eMotors securities.  As a result, Lightning eMotors received approximately $268 million in gross proceeds from the de-SPAC process.

87.     Immediately following the closing, GigAcquisitions3 (and thereby Katz and the Gig Defendants) owned 8.3% of Lightning eMotors' outstanding 73.2 million shares, Fenwick-Smith owned 6.8%, and Reeser owned 1.9%, while Aravaipa Venture Fund, in which Fenwick-Smith and Reeser both have financial interests, owned 6.3% (approximately 4.6 million shares).

88.     Just five days after the closing, on May 11, 2021, the new Lightning eMotors Board held its first meeting, where it reclassified the directors agreed to in the Proxy.  Now, Katz and Dinu would be Class I directors along with Miotto, requiring their re-election at the annual shareholder meeting to be held in October, rather than the respective three- and two-year initial terms that they would have served had they remained Class III and Class II directors.  Although this information was referenced in a Form 8-K filed on May 12, 2021, no reason was given for the sudden change in Board composition from what shareholders had voted for based on the Proxy just days earlier.

- 38 -

**G.** **Lightning eMotors Releases Poor First Quarter Results, But Continues to Deny Operational Issues**

89. On May 17, 2021, Lightning eMotors filed a Form 8-K(A) disclosing the results of Lightning Systems' 1Q21 operating results. Lightning had completed and sold just 31 vehicles and one powertrain kit, putting it far behind in achieving the 500 vehicle sales projected for 2021 in the Proxy. Total revenues for the quarter were $4,591,000, but the Company had a net loss for the quarter of $27,436,000. Less than *two weeks* after the Business Combination closed, Lightning revised its financial guidance downward, guiding $50 to $60 million in revenue for 2021 rather than the $63 million provided in the Proxy – an approximate 5%-20% revenue reduction.

90. According to the Company, supply chain delays and resultant "production inefficiencies" in 1Q21 had caused the shortfall in expected vehicle sales and increased cost of revenues. Nevertheless, Lightning eMotors reassured investors that it was still prepared to scale as planned, maintaining its 500 unit sales projection for 2021. Defendant Reeser emphasized that "'[a]s our production capacity, supply chain diversification, automation implementation and marketing efforts increased, so did our abilities to execute deliveries at a record pace. As a result, *Lightning eMotors is well-positioned to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles*.'" Although he indicated that supply chain shortages would "have a significant impact on short-term margin and operating costs, resulting in a small, negative gross margin for the full year," Reeser also stated that "'*Lightning eMotors' broad portfolio of products allows us to deliver despite the current supply chain unpredictability*, as we can move production to products for which we have chassis and components on-hand. *Even with our battery supply, we have . . . a safety net against any single supplier constraint*.'"

- 39 -

91. Financial analysts accepted Lightning's confident reassurances that its operations would continue as planned, even if they came with increased costs:

- **Northland Capital Markets** wrote on May 17, 2021, that "EV manufacturers are experiencing scarcities across the supply chain. Visibility is limited. *However ZEV's 500 unit sales guide implies acceleration from 1Q's 31 [units]*."

- **Colliers Securities** wrote on May 18, 2021 that "we believe the impact from national/global supply-chain issues was less than most," and "we believe worries about ZEV's ability to ramp-up may be unfounded." The following day it reported that "ZEV noted to us that despite the challenges seen in the supply chain, it will be able to deliver more vehicles in Q2 than in Q1" and "*the company still feels confident about delivering 500 vehicles this year*."

- **Benchmark** wrote on May 18, 2021 that while "the adverse impact from the chip shortage will likely lead to higher quarterly losses over the last nine months of the year[,] *[a]ccelerating production* should be a plus to 2022, leading to profitable operating performance."

92. Then, barely a week later, on May 27, 2021, the Company's Chief Procurement Officer who was in charge of the Company's supply chain logistics, Stephen Ivsan, resigned. Ivsan, whose hiring had been touted by Lightning Systems prior to the shareholder vote, had only been with the Company for a scant two months.

93. On June 16, 2021, Lightning eMotors' Board approved dramatic increases to the compensation of its executive officers. Specifically, Defendant Reeser's salary was more than doubled to $500,000 per year, he would be eligible for an annual bonus of up to $400,000, and he would receive a one time "special transaction bonus" in recognition of the closing of the Business Combination of $300,000. Defendants Covington and Fenwick-Smith, as well as COO Kelley, were also given "special transaction bonuses" of $50,000 each.

94. On June 17, 2021, Lightning eMotors held its first "Analyst Day," in which financial analysts were invited to Lightning's factory and given a presentation by Company management.

During the presentation, Company management emphasized that they leveraged an "established network of US commercial vehicle manufacturing partners – making it easier to scale!"  The Company reiterated that while chassis and battery supply constraints were impacting revenue timing, the Company was reaffirming its revised full-year revenue guidance of $50 to $60 million for 2021 and projecting a positive gross margin in the fourth quarter of 2021 ("4Q21").

95.     Company Chief Technology Officer and COO Kelley, discussing the battery supply chain, noted that "[t]he other serendipitous value is, because we have numerous supplies that can be applied to the same platforms.  When one supplier has a particular issue or a struggle, we're able to use multiple battery configurations on a particular chassis" and "that flexibility allows us . . . some diversification of our supply chain, when times get rough for some of these guys."  Defendant Covington agreed, stating that "as Bill talked about on his slide, we have multiple partners across many of the parts that we purchased, which is one of the ways that we have been one managing the cost, as well as managing some of the supply chain disruptions that we've had," and that the mature supply chain would help drive positive gross margin in 4Q21.  Covington also reaffirmed that Lightning was "planning to grow our capacity, estimating from 500 units [in 2021] to 3,000 units next year."

96.     Later, when analysts asked management about potential supply chain disruptions, Reeser responded, "[s]o, we can have – we have inventory on the side of chassis, we have inventory of batteries" and "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, *we do feel confident in [Lightning's financial projections]*."

- 41 -

97.     Analysts reacted positively to management's reaffirmation of guidance just two weeks prior to the end of the second quarter of 2021 ("2Q21") on June 30, 2021.  Colliers listed the reaffirmation of the revenue guidance as the first "Key Point" in its June 18, 2021 report.  The same day, Benchmark also highlighted the renewed revenue guidance, noting that Lightning eMotors was "[o]n [t]rack."  After the factory tour, Northland Capital believed the Company had an "[a]bove-[a]verage [s]ales [o]utlook" and that "ZEV [was] managing the [supply chain] risks by building redundancy in suppliers."  Oppenheimer, in its initiating report, praised "Lightning's diverse supply chain" and "[m]odularity" which "de-risks [the] supply chain" adding that they were "encouraged by management's supply chain and procurement strategies YTD [year to date] in navigating a production environment that appears to be more acutely impacting some of Lightning's peers."

98.     On July 8, 2021, Lightning eMotors filed a prospectus with the SEC on Form 424B3 (the "July 8 Prospectus").  The July 8 Prospectus stated that Lightning eMotors was positioned to take advantage of "a significant total addressable market of approximately $67 billion" and had "built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth."  The July 8 Prospectus added in relevant part as follows:

> ***We optimize our supply chain for quality, reliability, and cost.  We believe our long-term relationships with supply chain partners will be a key driver in our ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for our growth.  Because we have relationships with multiple suppliers for each core component of our vehicles, we are able to build and maintain a high degree of resilience in our supply chain, which will assist us with mitigating delays***.

99.     The July 8 Prospectus also listed a number of "Competitive Advantages" Lightning eMotors had over peers that purportedly would "allow [it] to maintain and extend [its] leadership position."  These "Advantages" included Lightning eMotors' "[e]stablished strategic partnerships to ***optimize procurement*** and go-to-market strategy" and the Company's "***extensive ecosystem of***

***supply-chain partners***" who were "instrumental to the performance and reliability of our vehicles and enable us to scale in a relatively asset light and cost-effective manner."  The July 8 Prospectus continued to list the Company's production capacity at 500 units per year, adding that because of its recent expansion, Lightning eMotors actually had "capacity to manufacture and assemble 3,000 ZEV vehicles and/or powertrain units per year, on a single labor shift."

100.    The charade continued to fool analysts.  In its initiating report, Davidson highlighted that "ZEV is enjoying actual orders and is delivering vehicles out of its binding backlog" adding that "ZEV appears better-positioned than most for success."

### H.    The Truth Is Revealed

101.    Then, after market-close on August 16, 2021, Lightning eMotors issued a press release (filed with the SEC on Form 8-K) announcing that it had sold only 37 vehicles and powertrain systems during 2Q21, for revenue of $5.9 million, as a result of "'supply chain challenges.'"  Its loss from operations was $17.9 million, compared to $2.7 million in the second quarter of 2020 ("2Q20"), while the net loss per share was $0.79, compared to $0.10 per share in 2Q20.  Lightning also reported that it had earned only $10.5 million during the first half of 2021, with a net loss during the first half of 2021 amounting to ***$73.5 million*** – a massive increase over the $5.6 million accrued during the same period in 2020.  The Company's gross margin also worsened to -19% during the quarter, as compared to -16% in 1Q21.

102.    The Company also announced that it was withdrawing its prior financial guidance for 2021, as it no longer expected to meet the numbers provided and would only be providing guidance for the following quarter.

- 43 -

Case 1:21-cv-03215-RMR-KLM   Document 20   Filed 05/20/22   USDC Colorado   Page 48 of 113

103.    Lightning eMotors' Form 10-Q quarterly report was also filed with the SEC following market-close on August 16, 2021.  In addition to presenting the Company's dismal financial results for the quarter, the Form 10-Q also disclosed that Katz, Dinu, and Miotto would not be running for re-election to the Lightning eMotors Board at the annual shareholders' meeting taking place on October 7, 2021.  It was clear upon such revelation that the GigCapital "Mentor-Investor" strategy that the Gig Defendants had so highly stressed and sold to investors, as well as their representations that the GigCapital management team was planning on remaining hands-on and helping the Lightning eMotors enterprise succeed over the next three-to-five years, had been materially false and misleading all along.  Having closed the Business Combination and made their profit, the GigCapital management team wanted no further involvement in Lightning eMotors and walked away after just ***three months***.  They were already on to their next SPAC scheme.

104.    Following these disclosures, Lightning's stock price dropped from a closing price of $9.63 per share on August 16, 2021, to close at $8 per share on August 17, 2021 – a massive single-day decrease of approximately 17%, on abnormally high trading volume.  Lightning's warrant price suffered a 21% single-day decrease, dropping to a closing price of $1.44 on August 17, 2021 from a prior-day closing price of $1.82.

**I.    Lightning's Continued Struggles and Management's Post-Class Period Admissions**

105.    Things did not improve for Lightning eMotors following the end of the Class Period. Although the Company has continued to highlight new orders, its supply chain problems have resulted in continued lackluster financial results.

106.    On November 15, 2021, the Company announced its third quarter 2021 ("3Q21") financial results, disclosing that it had earned only $16.8 million in revenue over the first nine

- 44 -

months of the year, and was on track to generate just $4 to 6 million more in the fourth quarter. Thus, in even a best case scenario, Lightning eMotors would actually earn only *36%* of the revenues purportedly under firm purchase orders as of December 10, 2020. Its net loss for the first nine months of 2021 was $123 million, almost five times more than during the same period the prior year.

107.    On November 29, 2021, Defendant Reeser did an interview with CompanyWeek, in which he conceded that Lightning's "supply chain has been largely made up of early-stage, small-volume manufacturers . . . And whether you're talking about small-scale fabricators or small scale manufacturers, it's just different. So we're pushing the supply chain up. And what we've found is, it's not as mature as everybody had hoped." He further stated that:

> No one else was building what [Tesla] needed in the quantities they needed it, so they had to go do it themselves. And the same thing has happened to us: We've had to pull in our own fabrication or manufactured parts because *we couldn't get them from other people in the scale we need them*.

108.    When the Company did announce its 2021 financial results on March 30, 2022, the discrepancy between actual results and what investors had been promised prior to the Business Combination was flagrant and telling. Revenue was $21 million, just *one-third* of what had been projected; only 146 vehicles were sold, as compared to the promised 500; and rather than decreasing significantly, costs of revenue increased by $15.2 million. As of May 16, 2022, Lightning eMotors' closing stock price was $3.94 — just *39%* of the pre-Business Combination redemption price of $10.10 per share.

## J.    Confidential Witness Accounts

109.    Several former Lightning eMotors and/or Lightning Systems employees have provided information demonstrating that Defendants' Class Period statements regarding Lightning's supply chain, positioning for rapid growth, and financial projections, were false and misleading and

- 45 -

that Defendants knew or recklessly disregarded the falsity of their statements.  These witnesses include individuals formerly employed at Lightning Systems prior to the Business Combination and/or at Lightning eMotors following the Business Combination that had familiarity with the design, production, and supply needs of Lightning's products.  Their accounts corroborate one another as well as facts now acknowledged by the Company.

110.    **Confidential Witness No. 1 ("CW-1")** was employed by Lightning Systems in early 2021, and remained at Lightning eMotors until mid-2021.  During most of CW-1's time at Lightning, CW-1 was a field service technician, responsible for repairing vehicles at customer sites around the country.  CW-1 stated that Lightning's documentation for building and repairing vehicles was "almost non-existent" and that technicians did not have readily available or organized diagnostic paperwork, such as diagrams, flowcharts or service manuals that described the components in the vehicles and how to conduct repairs.  Instead, technicians were usually required to "wing it" when doing their frequent vehicle repairs.  In CW-1's experience, the failure rate for vehicles sent to Lightning customers was around 40% to 50%.  CW-1 explained that it was frustrating that nearly half the vehicles that were sent to end-users had to be repaired, sometimes only a few days after the customer received the vehicle.  CW-1 said the problems were not confined to a particular type of vehicle that Lightning produced, but were "across the board."  A number of the vehicle failures resulted from quality issues with parts, including harnesses and batteries.  One of Lightning's key battery suppliers, eMatrix, supplied unreliable batteries so that technicians were constantly swapping batteries in customers' vehicles, and quality control was "almost non-existent" at Lightning.

111.    As of mid-2021, CW-1 was serving in a production role and, according to CW-1, it "didn't take much" to see that the company had supply chain issues.  It was a common practice for

the production team to start working on vehicles and then set them aside incomplete in order to wait for necessary parts to arrive. CW-1 said that this often occurred after the vehicles had been "de-comped" and that at one point, as many as 30 vehicles were on the floor waiting for parts. The biggest supply problem that the production team experienced was a shortage of batteries, as Lightning's battery suppliers could not keep up with demand.

112.    One of the reasons CW-1 left the Company was that CW-1 disagreed with certain "shady" manufacturing processes that took place in summer 2021, when the Company was suffering another shortage of eMatrix batteries. CW-1's supervisor told the employees on the production team to take the batteries out of at least six vehicles that had already been fully assembled and gone through the commissioning process, and then put the batteries in other vehicles and fully assemble them. CW-1's supervisor told the team that he did not want to do this and it was not his decision to do so; rather, CW-1's supervisor believed that the team was being instructed to take such actions in order for the Company to meet end-of-quarter production goals. The supervisor believed that the Company planned to count not only the completed vehicles that had batteries, but also the ones that had originally been completed (but then had the batteries removed), in its production totals.

113.    CW-1 explained that the ends of quarters were always a "cluster bomb" at Lightning, and that production quotas were a "big topic." CW-1 attended company-wide meetings led by Reeser where Reeser talked about how he wanted to increase production quotas and set "super aggressive" quota numbers. CW-1 stated that the Company's production targets, which increased "threefold" quarter by quarter, were unrealistic because Lightning did not have adequate processes in place to keep up with the quotas.

114.    **Confidential Witness Number 2 ("CW-2")** was employed at Lightning Systems from summer 2019 through spring 2020.  CW-2 is an engineer and while at Lightning Systems, served as a liaison between the engineering team, sales team, and customers.  As part of this role, CW-2 visited customers and explained technical details about the vehicles.  CW-2 reported to senior management and occasionally to COO Bill Kelley or Defendant Reeser when they needed technical assistance or feedback from customers.  CW-2 would text and email Reeser and Kelley from customer sites to keep them informed about developments with customers and issues that arose on the ground.

115.    CW-2 stated that Reeser was very "hands on" with the sales team and in interactions with customers, describing him as a "confident salesman" because he frequently framed things in the "best possible light."  CW-2 explained that some of the things Reeser said to customers may have "technically" been true, however they were not exactly accurate.  For example, CW-2 recalled Reeser making statements to a customer about the range of Lightning Systems' vehicles, but CW-2 knew that the range Reeser provided would actually be achievable only under ideal circumstances. CW-2 also recalled that Kelley sometimes challenged Reeser about inaccurate technical details, as when Reeser stated that a vehicle was 75% completed: it was actually closer to 60% complete and Kelley told Reeser not to "oversell" how close to completion the vehicle was.  CW-2 recalled that overpromising on timelines and performance had also impacted customer orders.  For example, while CW-2 was at Lightning Systems, a food truck company placed an order for 22 trucks, with Lightning Systems overpromising on the timeline on the trucks.  In fact, the trucks had not even been developed yet, so Lightning Systems employees "scrambled" to fill the order, but there were "all

- 48 -

sorts of problems" with the trucks, and after the customer received one truck, it cancelled the remainder of its $8.5 million "firm" order.

116.    CW-2 also attended a weekly sales team meeting at which Reeser and the sales team would go through the Company's order book and discuss what had recently been done for the orders and what else could be or needed to be done.  According to CW-2, because there was no penalty for a customer cancelling an order, an order still did not really "mean anything," and there were several instances of remaining orders of dozens of vehicles being cancelled when customers were unhappy with the first vehicles they received.  Lightning Systems had been selling vehicles that were not "production ready," and customers received vehicles that were more like "prototypes" than finished vehicles – a practice CW-2 did not agree with.  CW-2 often ended up doing unscheduled repair services when visiting customers because there were so many problems with the vehicles.  CW-2 stated that at Lightning Systems there was a constant "rush" and "panic" to get vehicles sent to customers, and the company would "pump out" vehicles "as fast as possible."  But, because the vehicles would then experience problems and customers were dissatisfied, the practice would "kill orders."  CW-2 described Lightning Systems as in a constant "self-defeating cycle."

117.    CW-2 stated that one of the main problems Lightning Systems' vehicles experienced were battery issues.  Larger battery suppliers did not want to work with Lightning Systems since it did not have enough business to place large orders, and so Lightning Systems had to work with smaller, "lower tier" suppliers, including Octillion and eMatrix.  Some of the batteries it received would not work well and caused the vehicles to shut down or operate at a reduced capacity.

118.    CW-2 believes that the production of Lightning Systems' vehicles was rushed because the company did not have enough money and was "coasting on fumes."  CW-2 knew about

- 49 -

Lightning Systems' need for funding because other employees talked about how Lightning Systems would receive some orders, everyone would "get excited," and new people were hired to fulfill the orders – then some of the orders would be cancelled, and the employees who had recently been hired were let go because Lightning Systems could not pay them.  This practice did not make sense to CW-2, as Lightning Systems required "skilled labor" and new employees had to be trained.  CW-2 described Lightning Systems management as having a lack of foresight into what orders were actually "firm," and that their growth projections and hiring practices were "not smart."  CW-2 stated that it was a known problem internally that Reeser acted like everything in Lightning Systems' order book were real orders that Lightning Systems was actually going to get, when some tiers of orders in the order book just indicated an "expression of interest."

119.    According to CW-2, a round of lay-offs in May 2020 occurred after orders with Amazon and a few other customers did not "pan out," although management claimed the lay-offs were pandemic-related.  When CW-2 first started working at Lightning Systems, there had been a "mad scramble" to fulfill an order from Amazon for 15 transit vans that were meant to be part of a "pilot" program, and the plan had been that Amazon would order a hundred more vehicles following the pilot.  But after Amazon had used the initial 15 vehicles that Lightning Systems delivered in October or November 2019, it was so dissatisfied with their lack of performance and shorter range than was promised that the number of vehicles that Amazon was going to order continually dropped and by spring 2020, the order was put on hold entirely.  CW-2's overall impression was that Lightning Systems "oversold" and "overcommitted."

120.    **Confidential Witness Number 3 ("CW-3")** was employed as a technician at Lightning Systems from late 2019 through spring 2020.  CW-3 was responsible for repairing

Lightning Systems-manufactured powertrains and vehicles at customer sites. CW-3 worked primarily on the Amazon account in 2020, which consisted of 15 Lightning Systems delivery vans in San Diego. CW-3 recalls numerous employees discussing safety concerns with Lightning Systems' vans that had been sent to customers, including how "crappy" and "sketchy" it was that Lightning Systems' vehicles were not safe. CW-3 said that the vehicles were "dangerous" because they were "underdeveloped" since they had been developed "way too fast" and adequate testing had not been performed on them.

121. CW-3 told a Director of Engineering at the company that most, if not all, of the vans at the Amazon site should be returned to Lightning Systems headquarters for a safety audit and repairs, but was told that Lightning Systems' management was unwilling to take that step. CW-3 said that as a "compromise," the company performed an on-site audit of the vehicles, but CW-3 maintained that it was not enough to resolve the problems with the vehicles because the vehicles simply did not have enough miles on them and had not been charged and discharged enough to identify all the bugs. CW-3 stated that Lightning's management "overpromised and underdelivered" to Amazon, because they had probably promised vetted vehicles that were a good quality product, and instead, the vehicles did not meet expectations. CW-3 had also been concerned about the safety of the vehicles, and stated that it was not fair to Amazon delivery drivers who did not know that they were driving vehicles that were "unverified," "untested," and "potentially unsafe." CW-3 recalls an instance in which, due to improperly made or improperly installed components, one of the Amazon vans turned off unexpectedly on the freeway, leaving the Amazon driver stranded.

122. CW-3 recalled a high-level employee at Amazon being angry about the number of repairs that had to be performed on the delivery vans in San Diego, and threatening Lightning

- 51 -

Systems employees that if they did not adequately fix the vehicles, Amazon would "pull the contract." CW-3 felt that Lightning Systems had "screwed up" the potentially $60-$70 million Amazon contract by sending underdeveloped vehicles to Amazon that had not been adequately tested. CW-3 felt that the company was not doing the right thing, and that it felt "shady" that the company was hiding performance problems from customers.

123.     **Confidential Witness Number 4 ("CW-4")** was a manufacturing supervisor at Lightning Systems for approximately one year, leaving in spring 2021. CW-4's position involved overseeing vehicle assembly, which included disassembling gas-powered vehicles and rebuilding them with new components to make them electric-powered. CW-4 worked on all types of Lightning Systems vehicles while with the company. At the beginning of CW-4's tenure with Lightning Systems, the company received gas-powered vehicles directly from its customers, which it would convert to electric; later, Lightning Systems began receiving shipments of newly manufactured vehicles directly from Ford for conversion. At the beginning of CW-4's employment, there were no standard operating procedures at the company; CW-4 was expected to figure out how to build the vehicles without written guidance. Toward the end of CW-4's employment, Lightning Systems began developing standard operating procedures, but by that time, Lightning Systems did not have adequate technology, tools, or procedures to support the rapid growth in production it desired. According to CW-4, this resulted in management putting unrealistic expectations on employees, who worked up to 70 hours per week to meet deadlines, and which led to workplace accidents. CW-4 stated that Lightning Systems management seemed more concerned about "pushing a vehicle out" than doing it the "right way."

124.    CW-4 explained that there were a lot of supply issues at Lightning Systems, especially with batteries, and that while the supply chain had always been a problem, it got progressively worse.  CW-4 explained that Lightning Systems worked with one battery supplier that would sometimes not send batteries because Lightning Systems had not paid its bills and was short on funds.  Then, even when Lightning Systems could pay its bill, the supplier could not send the batteries right away since it was small and built Lightning Systems' batteries to order.  The supplier could usually only build four to five batteries per week, possibly up to seven, so there were often weeks-long delays between the time an order was placed with the supplier and when the batteries were delivered.  CW-4 stated that overall, there was a "constant shortage" of parts, and they had to "scrounge" whatever parts they could get to build vehicles and ship them out.  Sometimes this meant using older, less powerful batteries when their preferred components were unavailable, or using a slower charging system with the expectation that the vehicles would later be "retrofitted" in the field by the service team with the faster charging system originally ordered by the customer.

125.    CW-4 also explained that because of the supply issues, it was common for CW-4's team to partially assemble vehicles and then set them aside for three to four weeks while waiting for additional components.  Typically, the team would only receive enough supplies to complete some of the unfinished vehicles, and which vehicles they decided to complete were based on the company's targeted production numbers rather than customer wait-time – the quantity of vehicles that Lightning Systems shipped to customers was Lightning Systems' management's priority.  CW-4 explained that while some vehicles only required one battery to be completed, others required two or three.  The production team would typically prioritize completing vehicles that only required one battery so that the company could complete more vehicles with the available parts.

126.     CW-4's team received vehicle conversion quotas each quarter, and CW-4 recalls knowing that the production team could not meet those numbers because of supply issues and delays.  For example, on one occasion, the team's production quota was 30 vehicles, but it only had sufficient batteries to build significantly less.  Toward the end of CW-4's employment, the supply problems were so significant that Lightning Systems was working on redesigning the charging system it used to alleviate the constraints.  In meetings CW-4 attended with COO Kelley and Director of Supply Chain & Operations McNeil, they discussed the company's problems obtaining batteries and difficulty meeting goals because of supply issues.

127.     CW-4 recalled Lightning Systems suffering from "a lot of money issues" prior to going public.  According to CW-4, Lightning Systems received funding shortly before merging with the SPAC in order to purchase equipment to make it look like the company was "worth more" and could do more things in-house.  CW-4 recalls meetings in which Kelley and Reeser (whom CW-4 referred to as a "show guy") discussed the SPAC and employees were told that it wouldn't "go well" if Lightning's production goals were not met.

128.     **Confidential Witness Number 5 ("CW-5")** was an engineer at Lightning Systems from spring 2019 through spring 2020.  During that time, CW-5 worked on the heating and air conditioning systems, batteries and electrical components of Lightning Systems' vehicles, and also traveled to customer sites to repair the vehicles.  CW-5, having been an engineer for more than a decade, was surprised by the lack of care at Lightning Systems and the number of problems its vehicles experienced.  CW-5 said that some of the vehicles were shipped out with known problems because the "number one concern" at Lightning Systems was getting purchase orders.  For example, employees from the financial and technical teams (including COO Kelley) had insisted that

- 54 -

Lightning Systems' "Proof-of-Concept" order to Amazon be shipped even though all of the issues hadn't been worked out yet. CW-5 spent quite a bit of time repairing vehicles at a shop in San Diego for Amazon, and from "hearing things around" Lightning Systems headquarters, believed that the vehicles were "well below [Amazon's] expectations."

129.    CW-5 explained that the problems with Lightning Systems' vehicles were well-known internally. Lightning Systems' testing of components was inadequate throughout CW-5's time at the company, and was non-existent at the beginning. There was also no "formal tracking tool" for employees to use in building the vehicles during CW-5's employment.

130.    **Confidential Witness Number 6 ("CW-6")** worked at Lightning Systems, and then Lightning eMotors, from mid-2019 through the end of the Class Period in several technical roles, including as a senior technician. CW-6's primary responsibility was to perform end-of-line-testing, which involved going through a checklist to ensure that the vehicles functioned correctly. CW-6 identified a lot of "issues" with the vehicles and reported them to the engineering team, but the problems were not resolved by the time CW-6 left the Company. CW-6 explained that in some cases, vehicles with unresolved issues were shipped out to customers with the intention of fixing the problems later. It was "relatively frequent" for vehicles to be shipped to customers with knowledge that some would need service "upon arrival." CW-6 said that there was internal pressure on employees, including from senior management, to get vehicles sent to customers regardless of whether the vehicles were thoroughly tested and ready to be sent.

131.    CW-6 explained that there were "always" at least some supply chain issues at Lightning, and that CW-6 does not believe the supply chain was as "robust" as the company represented to investors. CW-6 explained that there were "forced design changes" – including a

- 55 -

"pretty major design change" – as a result of supply chain breakdowns and supply shortages, issues that got "progressively worse" toward the end of 2020 and beginning of 2021.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     May 13, 2020 Registration Statement

132.     Defendants' materially false and misleading statements began on May 13, 2020, when the SEC declared effective GigCapital3's May 12, 2020 post-effective amendment to its Form S-1, which became the operative Registration Statement and Prospectus (the "Registration Statement"). The Registration Statement, in an effort to make GigCapital3 securities more attractive to investors with a sea of SPAC investments to choose from, falsely and misleadingly emphasized the Gig Defendants' intent to stay significantly involved with whatever target company was chosen following the closing of an initial business combination:

> Our management team has significant hands-on experience helping TMT companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies. *We intend to apply a unique "Mentor-Investor" philosophy to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company*. Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry, to *help shape corporate strategies*. Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles and has developed deep relationships with key large multi-national organizations and investors. *We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination*.

>                               *     *     *

> Consistent with our strategy, we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses and, when evaluating a prospective target business, we expect to conduct a thorough

- 56 -

due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us. ***We are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion***.

*     *     *

We will prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to ***succeed with support from an interactive and hands-on board of directors***.

133.    The statements in ¶132 were materially false and misleading or omitted material facts necessary to make them not misleading when made.  The Gig Defendants were not looking for a "partnership[]" with a target company or to remain engaged over a three-to-five year horizon to "help drive strategic dialogue, access new customer relationships and achieve global ambitions." Rather, the Gig Defendants intended to close an initial business combination, reap their profits, then use the additional credibility gained from having successfully completed another "de-SPAC" transaction to attract more investors into their next SPAC venture.  This was demonstrated when: (1) just ***five days*** after the Business Combination closed, Katz's and Dinu's directorships on the new Lightning eMotors Board were reclassified so that their initial terms as directors were shortened by years, to last only until the October 7, 2021 shareholder meeting; and (2) barely ***three months*** after the Business Combination closed, Lightning eMotors announced that ***none*** of the three GigCapital board members – Miotto, Dinu, or Katz – would stand for re-election.  Aside from their passive financial interest in the Company through holding shares (which were still "locked up" and could not be sold), the Gig Defendants had no further direct involvement in the management or strategy of Lightning eMotors following the October 7, 2021 Board meeting.  ¶¶50, 88, 103.

- 57 -

B.        **December 10, 2020 Press Release and Investor Call**

134.      On December 10, 2020, GigCapital3 and Lightning Systems issued a joint press release announcing their Business Combination agreement.  The release represented that Lightning Systems had "***[h]igh revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today***."  The release further stated that "[c]urrently, Lightning eMotors has a contracted order backlog of approximately 1,500 vehicles for delivery in 2021 and 2022 . . . with ***annual production capacity of 1,000 vehicles today and expanding to 3,000 in 2021*** and over 20,000 by 2025."  Defendants also claimed the Company had a "***strong line of sight to $2 billion in projected 2025 revenue***."  In the release, Defendant Reeser stated that the "'capital raised in this transaction will enable Lightning eMotors ***to accelerate its growth plans and fulfill significant demand*** from our customers.'"

135.      Also on December 10, 2020, GigCapital3 and Lightning Systems hosted a call with investors.  During the call, Dinu once again emphasized that "[a]s part of GigCapital3's Private-to-Public Equity (PPE)™ strategy, we look for opportunities where we can quickly bring Companies to the public market in order to accelerate their growth and ***partner with them for the long-term***."  Dinu stated that of all the companies that the Gig Defendants had looked at, "Lightning eMotors is the only company that met our target objectives."

136.      Dinu also stated that the proceeds from the merger would "support Lightning eMotors' management's business plan ***to scale the operations***" and would cause Lightning eMotors to "***be fully financed to expand capacity from 1,000 vehicles per year currently to 10,000 vehicles per year in 2022***."  Dinu added that the Company has "the ***best revenue visibility***" and that its backlog of contracts would allow Lightning eMotors to "***quickly scale revenues***."

- 58 -

137.    Dinu's comments were reiterated by Defendant Reeser, who stated the following with respect to the Company's revenue "visibility":

> Those orders and those customers that we've already earned provide a great deal of insight into our projected revenue of $2 billion for 2025, and **provide strong visibility over the next five years** end to where that revenue comes from and what it is, with contracted orders that we already have in place today.

138.    Defendant Fenwick-Smith represented that the Company had "**confidence in '21 and '22**" projections because their "backlog of contracted purchase orders . . . mean[t] that **all of 2021 is contracted**."  Fenwick-Smith also emphasized the competitive advantage of Lightning Systems' existing supply chain, stating: "we're Gen[eration]3, so we've labored three years to get to Gen3, and this means with Gen3 we've been able to start to industrialize and **also have already built relationships with the suppliers**.  Very important."  Summarizing the presentation, Dinu stated that "Lightning eMotors is a strong company, [and] **has in place the pillars of success to drive solid financials** that result in a great investment opportunity."

139.    The statements in ¶¶134-138 above were materially false and misleading or omitted material facts necessary to make them not misleading when made, for the following reasons:

(a)    The Gig Defendants were not looking to partner with Lightning "for the long-term."  Rather, the Gig Defendants intended to close an initial business combination, reap their profits, then use the additional credibility gained from having successfully completed another "de-SPAC" transaction to attract more investors into their next SPAC venture.  This was demonstrated when: (1) just **five days** after the Business Combination closed, Katz's and Dinu's directorships on the new Lightning eMotors Board were reclassified so that their initial terms as directors were shortened by years, to last only until the October 7, 2021 shareholder meeting; and (2) barely **three**

*months* after the Business Combination closed, Lightning eMotors announced that *none* of the three GigCapital Board members – Miotto, Dinu, or Katz – would stand for re-election. ¶¶50, 88, 103;

      (b)     Lightning Systems' financial projections, including its $63 million target for 2021, as well as its promises of rapid production acceleration, were unrealistic and unachievable. As described in ¶¶77-84, 110-113, 117-131, Lightning Systems did not have the operational framework in place to be able to scale production at the pace promised investors, let alone the "pillars of success to drive solid financials" that Dinu represented. The company did not have a robust supply chain, and as Reeser would later concede, it had always relied on "early-stage, small-volume manufacturers" who had never had to deliver more than a few dozen parts at a time. Even operating at *that* scale, Lightning Systems frequently suffered from supply chain shortages that crippled its production capacity. And far from having established relationships with the necessary suppliers to scale, as investors were told, Lightning Systems was still in the process of vetting suppliers and determining which parts to use. Lightning Systems also did not have the trained staff necessary to accelerate its production at the rate promised due to its high turnover and layoffs. More, the company did not have the standardized procedures in place to allow employees to perform their jobs in a manner suited to rapid expansion of production. ¶¶77-84, 107, 110-113, 117-131;

      (c)     As explained in ¶¶83-84, 115-116, 118-119, statements that Lightning Systems had "strong visibility" into its projected revenues due to its purportedly massive backlog of orders were misleading because Lightning Systems' purchase order contracts were cancellable, largely without any penalty. It was not uncommon for customers to cancel large orders after receiving an initial delivery of and testing Lightning Systems' vehicles, just as Amazon did in 2020. More, as described in ¶139(b), above, Lightning Systems' supply chain was unreliable and not built

- 60 -

to operate at the scale needed to achieve the projected revenues. Accordingly, Lightning Systems could not have high visibility into its projected revenues because it did not know whether it would be able to get the parts necessary to complete and sell the number of vehicles required to produce such revenue, nor could it be confident that the orders in its backlog would not be cancelled. ¶¶77-84, 110-113, 115-131; and

(d)     Despite Dinu representing that Lightning Systems currently had production capacity of 1,000 vehicles, it was later disclosed in the Proxy that Lightning Systems only had current capacity to build 500 vehicles. ¶149.

C.     **January 4, 2021 Slide Deck**

140.     On January 4, 2021, GigCapital3 filed a slide deck with the SEC discussing the Business Combination pursuant to Rule 425 of the 1933 Act. The slide deck listed as "Key Investment Highlights" Lightning Systems' "***Robust Contracts with Financial Visibility***," including that it purportedly had "***100% of 2021 revenue forecast contracted as of Q3 2020***."

141.     The January 4, 2021 slide deck also asserted that Lightning Systems' ability to work with multiple supply chain partners "***has prevented major disruptions in production***" despite the disruptions COVID-19 had inflicted on the global supply chain, and that Lightning Systems "***has added and built additional redundancies into the supply chain*** . . . ***to mitigate supply-chain risk***."

142.     The presentation also highlighted Amazon as one of Lightning Systems' "***Select Key Customers***":



143.    The statements identified in ¶¶140-142, above, were materially false and misleading or omitted material facts needed to make them not misleading when made, for the following reasons:

(a)    Lightning Systems did not have a reasonable basis for asserting that it had financial visibility into 2021 revenue.  Lightning Systems' purchase order contracts were cancellable, largely without any penalty.  It was not uncommon for customers to cancel large orders after receiving an initial delivery of, testing, and being dissatisfied with Lightning Systems' vehicles, just as Amazon did in 2020.  More, as described in ¶139(b), above, Lightning Systems' supply chain was unreliable and not built to operate at the scale needed to achieve the projected revenues. Accordingly, Lightning Systems could not have high visibility into its projected revenues because it did not know whether it would be able to get the parts necessary to complete and sell the number of vehicles required to produce such revenue, and could not be confident that customer orders would not be cancelled.  ¶¶77-84, 110-113, 115-131;

(b)    The company did not have a robust supply chain, and as Reeser would later concede, it had always relied on "early-stage, small-volume manufacturers" who had never had to

deliver more than a few dozen parts at a time.  Even operating at ***that*** scale, Lightning Systems had suffered from supply chain shortages that ***crippled*** its production capacity.  These supply shortages had gotten progressively worse through 2020 into early 2021, such that employees were using whatever parts they could "scrounge" – even older or unreliable parts – with the expectation that they would need to replace them later, just in order to complete vehicles.  Further, Lightning Systems did not have a diversified supply chain, but worked with a small pool of suppliers such that its supply chain disruption risk was substantial, not "mitigat[ed]."  More, not only had Lightning Systems experienced "major disruptions" from supply chain problems, but the supply chain-caused delays were so severe that in early 2021, Lightning Systems was forced to make design changes to its vehicles in an unsuccessful attempt to overcome the supply shortages.  ¶¶82, 126, 131; and

(c)     Amazon was not a "[k]ey [c]ustomer" of Lightning Systems by this time. Amazon had conducted a pilot program with 15 Lightning Systems vans in San Diego in 2019 and early 2020, but that pilot program had gone terribly.  The vehicles were rushed to Amazon without adequate testing, and needed frequent repairs.  Frustrated by the vehicles' lack of performance and reliability, Amazon had cancelled its future orders of Lightning Systems vehicles by January 2021. ¶¶83, 119-122, 128.

**D.     January 12, 2021 ICR Conference slide deck**

144.     On January 12, 2021, GigCapital3 filed a slide deck it used at the Winter 2021 ICR Conference with the SEC pursuant to Rule 425 of the 1933 Act.  The deck reiterated that GigCapital's Mentor-Investor strategy would have it "***Participating actively at the company's BOD and SAB [Strategic Advisory Board]***" and "***Provid[ing] continuous Financing and M&A advisory***

*for growth and consolidation" for two-to-five years* post-closing.[12]  The deck represented that "Per

GigCapital Mentor-Investor™ charter" "GigCapital members to join Lightning eMotors BOD and

SAB" *"To provide continued support and guidance* on audit, governance, financing, M&A."

145.    The statements in ¶144, above, were materially false and misleading or omitted

material facts necessary to make them not misleading when made.  The Gig Defendants were not

looking to partner with Lightning eMotors over the two-to-five years post-closing, or to actively

participate in Lightning eMotors' Board of directors, as implied by their presentation.  Rather, the

Gig Defendants intended to close an initial business combination, reap their profits, then use the

additional credibility gained from having successfully completed another "de-SPAC" transaction to

attract more investors into their next SPAC venture.  This was demonstrated when: (1) just *five days*

after the Business Combination closed, Katz's and Dinu's directorships on the new Lightning

eMotors Board were reclassified so that their initial terms as directors were shortened by years, to

last only until the October 7, 2021 shareholder meeting; and (2) barely *three months* after the

Business Combination closed, Lightning eMotors announced that *none* of the three GigCapital board

members – Miotto, Dinu, or Katz – would stand for re-election.  ¶¶50, 88, 103.

### E.    March 26, 2021 Proxy

146.    On March 26, 2021, GigCapital3's Proxy was declared effective by the SEC and

disseminated to GigCapital3 shareholders.  In the Proxy, the GigCapital3 board unanimously

recommended shareholders vote to approve the Business Combination at the special meeting of

shareholders scheduled for April 21, 2021.  The purported reasons shareholders should approve the

---

[12]   This false representation was later repeated in GigCapital3's March 15, 2021 SEC filing pursuant
to Rule 425 of the 1933 Act.

4864-8659-5614.v1

merger stated in the Proxy included, *inter alia*, Lightning Systems' "Strong Customer Demand," as well as its "Competitive Advantages In Cost of Ownership and Fueling Infrastructure" and "***Vehicle Performance***." The Proxy stated that among the Company's competitive advantages were its "[a]bility to offer cost effective solutions" due to "***long-term relationships with supply chain partners [that] ha[d] prepared [Lightning eMotors] to scale in a cost effective manner***."

147. The Proxy stated that Lightning Systems was on track to achieve $63 million in revenue in 2021 with a 14% gross profit margin, and $354 million in 2022 with a 19% gross profit margin, providing the following chart of financial results and growth trends:

### Lightning Systems Key Financials

| ($ in million, unless otherwise noted) | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
|---|---|---|---|---|---|---|
| Revenue | $ 9 | $ 63 | $354 | $640 | $1,165 | $2,012 |
| *Gross Growth* | *NM* | *NM* | *462%* | *81%* | *82%* | *73%* |
| Gross Profit | $ 0 | $ 9 | $ 68 | $140 | $ 296 | $ 528 |
| *Gross Margin* | *3%* | *14%* | *19%* | *22%* | *25%* | *26%* |
| Adjusted EBITDA | ($ 11) | ($ 17) | $ 15 | $ 50 | $ 155 | $ 315 |
| *Adjusted EBITDA Margin* | *(122%)* | *(27%)* | *4%* | *8%* | *13%* | *16%* |

148. The Proxy represented that Lightning Systems had "***optimize[d] [its] supply chain for quality, reliability, and cost***" and "***maintain[ed] a high degree of resilience in our supply chain" in order to "mitigat[e] delays***." The Proxy also stated that "careful supply chain management" by Lightning "can reduce our cost-of-goods-sold ***by up to 50% over the next 18 months***." Further, the Proxy stated that Lightning Systems had "built an ***extensive ecosystem of supply-chain partners***" with which they had "[c]ontinuous communication."

149. Inexplicably, the production capacity had apparently dropped from 1,000 vehicles annually in December 2020 to just 500 vehicles annually. Furthermore, Lightning Systems was now

4864-8659-5614.v1

anticipating on expanding production capacity to 3,000 units per year by 2022, not by 2021 as stated

in December 2020.  The Proxy stated in relevant part:

> **We currently operate a single labor shift with a capacity to manufacture and assemble 500 ZEV vehicles and/or powertrain units per year** in a facility with approximately 70,000 square feet of manufacturing space.  In November of 2020, Lightning Systems built out 20,000 square feet in our current building and executed a lease for an additional 107,000 square feet of manufacturing space in the adjacent building.  The campus has a total of nearly 1 million square feet, of which over 500,000 is still available.  Lightning Systems also has a first right of refusal to lease the remaining 500,000 square feet in the campus over the next 4 years.  **With the additional space added this year, along with additional labor, automation, and larger batch manufacturing, we have capacity to manufacture and assemble 3,000 ZEV vehicles and/or powertrain units per year, on a single labor shift**.

150.    The Proxy also reiterated that the Gig Defendants would maintain a "Mentor-

Investor" relationship with Lightning eMotors for three-to-five years after the initial Business

Combination.  The Proxy stated, in relevant part:

> In the prospectus for our IPO, we identified the following general criteria and guidelines that we believed would be important in evaluating prospective target businesses, although we indicated we may enter into a business combination with a target business that does not meet these criteria and guidelines.  Generally, *we stated that we are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion*.  The Company's Board considered each of the factors identified in the IPO prospectus in its evaluation of Lightning Systems.  Furthermore, in light of the due diligence conducted of Lightning Systems and the evaluation of the following factors with regard to Lightning Systems, the Company's Board's decision to pursue a Business Combination with Lightning Systems resulted in the Company's Board deciding not to forego this Business Combination and instead continue to look for an alternative acquisition target.

> *       *       *

> **We believe that through our Mentor-Investment approach, we will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation**.  In particular, Lightning System's intent stated to us in diligence to pursue acquisitions as a means to accelerate its growth plans or augment its internal product and service development if such acquisitions represent a strategic fit, drive value and are consistent with its overall strategy *is well suited to the assistance that we can*

4864-8659-5614.v1

*provide*, and makes Lightning Systems a very suitable target for our business combination.

*      *      *

Notwithstanding the significant progress that Lightning Systems has made in developing itself as a market leader, with $169 million of backlog as of December 31, 2020, and a pipeline of $800 million of sales as of December 31, 2020, it is still a relatively small company, with 93 employees and 43 contractors as of December 31, 2020, *with substantial growth opportunity in front of it that we believe can benefit from our Mentor-Investment approach*.

151.    The statements in the Proxy identified in ¶¶146-150 above were materially false and misleading when made or omitted material facts necessary to make them not misleading for the following reasons:

(a)    The Gig Defendants were not looking to partner with Lightning eMotors over a "3 to 5 year horizon" post-closing, nor to actively participate in Lightning eMotors' strategy through a Mentor-Investor approach to "successfully exploit opportunities for value creation." Rather, the Gig Defendants intended to close the Business Combination, reap their profits, then use the additional credibility gained from having successfully completed another "de-SPAC" transaction to attract more investors into their next SPAC venture.  This was demonstrated when: (1) just *five days* after the Business Combination closed, Katz's and Dinu's directorships on the new Lightning eMotors Board were reclassified so that their initial terms as directors were shortened by years, to last only until the October 7, 2021 shareholder meeting; and (2) barely *three months* after the Business Combination closed, Lightning eMotors announced that *none* of the three GigCapital board members – Miotto, Dinu, or Katz – would stand for re-election to the Board.  ¶¶50, 88, 103;

(b)    The company did not have a robust or resilient supply chain, and as Reeser would later concede, it had always relied on "early-stage, small-volume manufacturers" who had

- 67 -

never had to deliver more than a few dozen parts at a time. Even operating at *that* scale, Lightning Systems had suffered from supply chain shortages that crippled its production capacity. In fact, the supply chain-caused delays were so severe that in early 2021, Lightning Systems was forced make design changes to its vehicles in an unsuccessful attempt to overcome the supply shortages. Lightning Systems' supply chain was simply not sufficient to allow it to "scale in a cost effective manner." These supply shortages had gotten progressively worse through 2020 into early 2021, such that employees were using whatever parts they could "scrounge" – even older, unreliable parts – with the expectation that they would need to replace them for customers later, just in order to complete vehicles. Further, Lightning Systems did not have a diversified supply chain, but worked with a small pool of suppliers such that its supply chain disruption risk was substantial, not "mitigat[ed]," and left Lightning Systems with little leverage to bring down costs in a market where parts such as electric vehicle batteries were in high demand. Nor were its relationships with suppliers necessarily "long-term," as Lightning Systems was still vetting suppliers to determine what parts it needed. ¶¶79-82, 110-111, 117, 124-126, 131;

(c)     Lightning Systems' supply chain was not optimized for quality or reliability, nor did Lightning Systems' "vehicle performance" provide a reasonable basis for the Gig Defendants to recommend the Business Combination. The failure rate of Lightning Systems' vehicles was 40 to 50% in early 2021, and one of the primary reasons was because of unreliable components such as batteries and harnesses. According to former employees of Lightning Systems, service technicians were frequently called to customer sites to replace unreliable batteries in vehicles. They were also frequently required to make repairs on Lightning Systems vehicles just days after they were delivered to the end customers. More, quality control was "almost non-existent" at Lightning

- 68 -

Systems in early 2021, and Lightning Systems management was more concerned with pushing vehicles out to the customers than with ensuring the components in the vehicles or the vehicles themselves were thoroughly tested.  ¶¶83-84, 110, 112-113, 116-118, 120-123, 128-130;

> (d)    Lightning Systems' stated annual production capacity of 500 vehicles with one shift per year was misleading, as the Lightning Defendants knew that the company lacked the necessary standardized procedures, tools, technology, staff or supplies to sustainably produce 500 vehicles per year, even if its facility had the space to do so.  As it stood, Lightning Systems production employees worked 70-hour weeks as a result of management pressure to get vehicles built on unrealistic timelines, while employees knew that production targets were unachievable due to a lack of supplies and trained staff.  ¶¶83-84, 110, 112-113, 116-118, 120-123, 128-130; and

> (e)    For the reasons stated in ¶151(a)-(d), the financial projections provided in the Proxy were unrealistic and unachievable, as were statements that it would reduce its cost-of-goods-sold by up to 50% over the next 18 months through careful supply chain management.  More, as the Proxy was issued just days before the end of Lightning Systems' first financial quarter, Defendants had information demonstrating that Lightning Systems was far from on track to achieve its aggressive targets.  ¶¶69-70.

### F.    March 26, 2021 Press Release

152.    In a press release announcing issuance of the Proxy on March 26, 2021 that GigCapital3 filed with the SEC pursuant to Rule 425 of the 1933 Act, Defendant Dinu stated that "'The GigCapital team *stays true to our Mentor Investor mission* partnering with the exceptional management team of Lightning eMotors *through the IPO and beyond*, *as we continue to build together a solid company to last*.'"  Defendant Reeser further touted that "'*Lightning eMotors has*

- 69 -

*maintained remarkable momentum* since we announced the proposed business combination in December.'"

153.   The statements in ¶152, above were materially false and misleading and omitted material facts necessary to make them not misleading when made.  As Defendants knew, or were reckless in not knowing:

(a)   The Gig Defendants were not looking to partner with Lightning eMotors post-closing "'to build together a solid company to last,'" nor to actively participate in Lightning eMotors' strategy through mentoring.  Rather, the Gig Defendants intended to close the Business Combination, reap their profits, then use the additional credibility gained from having successfully completed another "de-SPAC" transaction to attract more investors into their next SPAC venture. This was demonstrated when: (1) just *five days* after the Business Combination closed, Katz's and Dinu's directorships on the new Lightning eMotors Board were reclassified so that their initial terms as directors were shortened by years, to last only until the October 7, 2021 shareholder meeting; and (2) barely *three months* after the Business Combination closed, Lightning eMotors announced that *none* of the three GigCapital board members – Miotto, Dinu, or Katz – would stand for re-election to the Board.  ¶¶50, 88, 103; and

(b)   Lightning Systems had not "maintained remarkable momentum" in 1Q21. Rather, with just a few days left in Lightning Systems' financial quarter at the time Reeser made the statement above, Defendants knew that Lightning Systems had fallen far behind its production targets due to supply chain shortages and delays, having completed and sold just 31 vehicles and 1 powertrain kit.  This put it far behind in achieving the 500 vehicle sales projected for 2021 in the Proxy, and to make matters worse, the Company would later disclose a net loss for the quarter of

$27,436,000.  More, Lightning Systems' vehicles were suffering a 40 to 50% failure rate requiring frequent visits to customer sites for servicing, and the company had been forced to make changes to the designs in its vehicles in early 2021 in an unsuccessful effort to mitigate ongoing and progressively worsening supply shortages.  ¶¶82-84, 110, 112-113, 116-118, 120-123, 126, 128-131.

G.   **March 31, 2021 Form 10-K**

154.   The Gig Defendants continued to reiterate that they would "partner" with Lightning eMotors in a mentorship capacity in GigCapital3's Form 10-K for fiscal year ("FY") ended December 31, 2020 on March 31, 2021 (the "2020 10-K").  The 2020 10-K stated, in relevant part:

> Our management team has significant hands-on experience helping Technology, Media and Telecommunications ("TMT") companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies.  ***We intend to apply a unique "Mentor-Investor" philosophy to partner with Lightning where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company***.  Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry to help shape corporate strategies.  Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles, and has developed deep relationships with key large multi-national organizations and investors.  We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination.  We believe that we are providing an interesting alternative investment opportunity that capitalizes on key trends impacting the capital markets for TMT companies.

155.   Defendants' statements referenced in ¶154 above were materially false and misleading or omitted material facts necessary to make them not misleading when made.  The Gig Defendants were not looking to partner with Lightning eMotors post-closing "'to build together a solid company to last,'" nor to actively participate in Lightning eMotors' strategy through mentoring.  Rather, the Gig Defendants intended to close the Business Combination, reap their

profits, then use the additional credibility gained from having successfully completed another "de-SPAC" transaction to attract more investors into their next SPAC venture.  This was demonstrated when: (1) just *five days* after the Business Combination closed, Katz's and Dinu's directorships on the new Lightning eMotors Board were reclassified so that their initial terms as directors were shortened by years, to last only until the October 7, 2021 shareholder meeting; and (2) barely *three months* after the Business Combination closed, Lightning eMotors announced that *none* of the three GigCapital board members – Miotto, Dinu, or Katz – would stand for re-election to the Board.  ¶¶50, 88, 103.

### H.   May 17, 2021 Press Release and Form 10-Q

156.    On May 17, 2021, Lightning eMotors issued a release announcing the Company's financial results for the 1Q21.  The release stated that Lightning eMotors was lowering 2021 guidance, stating that "[b]ased on current business conditions," for the full year 2021, the Company expected "*revenues to be in the range of $50 million to $60 million*."  Despite the lowered guidance, the release stated that Lightning eMotors remained well-positioned to continue robust growth plans and navigate supply chain headwinds.  For example, the release stated that, "[d]espite supply chain headwinds," the Company achieved "sales of 31 zero-emission commercial vehicles." In the release, Defendant Reeser added that "'*Q1 2021 continued the fast sales and delivery growth that started in 2020*'" and that Lightning eMotors "'is *well-positioned to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles*,'" despite "supply chain shortages." Defendant Reeser continued in pertinent part as follows:

> "We are delivering purpose-built commercial zero-emission vehicles today from a factory that is already in production, continuing to add to our two years of customer on-the-road experience, validation and data.  Q1 2021 continued the fast sales and delivery growth that started in 2020.  *As our production capacity, supply*

*chain diversification, automation implementation, and marketing efforts increased, so did our abilities to execute deliveries at a record pace. As a result, Lightning eMotors is well-positioned to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles*. Our results, and the head start that our data, production experience and customer validation provide us, demonstrates the value of real purchase orders and real deliveries."

". . . The capital raised in the merger transaction *will enable Lightning eMotors to accelerate its growth plans and fulfill significant demand from our customers*, including some of the most recognizable transportation, public safety and e-commerce companies in the U.S. We are excited to begin our next chapter as a public company."

\* \* \*

"*Lightning eMotors' broad portfolio of products allows us to deliver despite the current supply chain unpredictability*, as we can move production to products for which we have chassis and components on-hand. Even with our battery supply, we have multiple pack suppliers supporting multiple platforms and applications, providing a safety net against any single supplier constraint."

157.    Also on May 17, 2021, Lightning eMotors filed with the SEC a quarterly report for the 1Q21 on Form 10-Q. The report was signed by Defendants Reeser and Covington, who also signed certifications attesting to the report's accuracy and completeness. The report included the quarterly financial results provided in the 1Q21 Release.

158.    The statements in ¶¶156-157, above were materially false and misleading and omitted material facts necessary to make them not misleading when made. As Defendants knew, or were reckless in not knowing:

(a)    Lightning eMotors was not well-positioned to meet either its 500-vehicle guidance or its revised revenue guidance of $50-63 million for 2021, nor was it successfully overcoming supply chain unpredictability. Rather, Defendants knew that Lightning had fallen far behind its production targets due to supply chain shortages and delays that had been getting progressively worse over the course of the year and showed no signs of abating. The Company had

- 73 -

already been forced to make changes to the designs in its vehicles in early 2021 in an unsuccessful effort to mitigate the ongoing and progressively worsening supply shortages, while incomplete vehicles sat on the manufacturing floor for weeks, even months, waiting for parts before they could actually be shipped to customers and earn revenue.  Internally, employees recognized that the quarterly production totals set by Lightning management were unrealistic, as the Company did not have the staff, supplies or processes in place necessary to achieve them. ¶¶82-84, 110-113, 116-118, 120-123, 126, 128-131.

       **I.**      **June 17, 2021 Analyst Day Presentation**

     159.    On June 17, 2021 – with less than two weeks left in Lightning eMotors' second fiscal quarter – the Company held an Analyst Day hosted by Defendants Reeser and Covington.  During the presentation, Company management emphasized that it leveraged an "***established network of US commercial manufacturing partners – making it easier to scale***!"  During her presentation, Defendant Covington stated, "Updated fiscal 2021 guidance.  ***We are reaffirming our revenue range of $50 million to $60 million.***  Last month, we announced a small negative gross margin. Here we're providing guidance of minus 2% to minus 4% gross margin."

     160.    The slide deck used in the Analyst Day, and filed with the SEC the same day, identified Lightning eMotors' "efficient manufacturing," and "reliable, validated suppliers" as "Technology Competitive Strengths."

     161.    During his presentation, COO Kelley, discussing the battery supply chain, noted that "[t]he serendipitous value is, because we have numerous supplies that can be applied to the same platforms.  When one supplier has a particular issue or a struggle, we're able to use multiple battery configurations on a particular chassis" and "that flexibility ***allows us some diversification of our***

*supply chain*, when times get rough for some of these guys."  Defendant Covington agreed, stating that "as Bill talked about on his slide, ***we have multiple partners across many of the parts that we purchased, which is one of the ways that we have been one managing the cost, as well as managing some of the supply chain disruptions that we've had***," and that the mature supply chain would help drive positive gross margin in 4Q21.  When analysts asked Lightning eMotors management about potential supply chain disruptions, Reeser responded: "So, we can have – ***we have inventory on the side of chassis, we have inventory of batteries***" and "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, ***we do feel confident in [Lightning eMotor's projections]***."

162.    The statements in ¶¶159-162, above, were materially false and misleading or omitted material facts necessary to make them not misleading when made, as Defendants knew or were reckless in not knowing at the time:

(a)    The Lightning Defendants Katz, Dinu and Miotto knew that Lightning eMotors would very likely not be able to achieve even its reduced financial guidance for FY 2021, and was ***not*** well-positioned to achieve its 2021 forecast.  The Company's supply chain shortages, always a problem, had gotten progressively worse through 1Q21 and did not show signs of easing. Employees frequently were forced to leave incomplete vehicles for weeks at a time on the factory floor while they waited for necessary components to be delivered.  Primary among these components were batteries, directly contrary to Reeser's statements that the company had sufficient inventory. Senior Lightning eMotors employees, including Kelley and McNeil, discussed the Company's problems obtaining batteries and difficulty meeting production goals because of supply issues.  Just months previously, the company had been forced to make design changes to its vehicles in an

unsuccessful bid to mitigate supply shortages.  While the ability to use certain parts across different types of vehicles did enhance operational flexibility, it did not mitigate the severe shortages preventing completion of vehicles.  Instead, it meant that production floor employees were directed to complete vehicles requiring a single batteries before vehicles requiring two or three batteries in order to get more vehicles out the door and prop up Lightning eMotors' production figures.  ¶¶82-84, 110-113, 116-118, 120-126, 128-131; and

(b)     The Company did not have an "established network" of "manufacturing partners" that allowed it to scale up at the rates it had promised investors.  As Reeser would later concede, Lightning had always relied on "early-stage, small-volume manufacturers" who had never had to deliver more than a few dozen parts at a time.  Even operating at *that* scale, Lightning had suffered from supply chain shortages that crippled its production capacity.  Lightning's supply chain was simply not sufficient to allow it to scale, let alone in a cost-effective manner during an exacerbated supply chain environment.  Lightning's supply shortages had gotten progressively worse through 2020 into early 2021, such that employees were using whatever parts they could "scrounge" – even older, unreliable parts – with the expectation that they would need to replace them for customers later, just in order to complete vehicles.  Further, Lightning did not have a diversified supply chain, but worked with a small pool of suppliers such that its supply chain disruption risk was substantial, not "mitigated," and left Lightning with little leverage to bring down costs in a market where parts such as electric vehicle batteries were in high demand.  ¶¶79-82, 110-111, 117, 124-126, 131.

J.      July 8, 2021 Prospectus

163.    On July 8, 2021, Lightning eMotors filed a prospectus on Form 424B3 (the "Prospectus") with the SEC.  The Prospectus stated that Lightning eMotors was positioned to take advantage of "a significant total addressable market of approximately $67 billion" and had "***built an extensive ecosystem of supply-chain partners*** and specialty vehicle partners which are instrumental to our growth."  The Prospectus added in relevant part as follows:

> ***We optimize our supply chain for quality, reliability, and cost. We believe our long-term relationships with supply chain partners will be a key driver in our ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for our growth. Because we have relationships with multiple suppliers for each core component of our vehicles, we are able to build and maintain a high degree of resilience in our supply chain, which will assist us with mitigating delays***.

*    *    *

> ***We believe, that through careful supply chain management and the cultivation of long-term relationships with our suppliers, we can reduce our cost-of-goods-sold by up to 50% over the next 18 months. Continuous communication and partnerships with all of our suppliers has enabled us to maintain cutting-edge technology in our vehicles at the lowest possible cost***.

164.    The Prospectus also listed a number of "competitive advantages" possessed by Lightning eMotors that purportedly would "allow [it] to maintain and extend our leadership position."  These "advantages" included Lightning eMotors' "***[e]stablished strategic partnerships to optimize procurement and go-to-market strategy***" and the Company's "***extensive ecosystem of supply-chain partners***" who were "instrumental to the performance and reliability of our vehicles and ***enable us to scale in a relatively asset light and cost-effective manner***."

165.    The statements in ¶¶163-164, above, were materially false and misleading or omitted material facts necessary to make them not misleading when made, as Defendants knew or were reckless in not knowing that:

- 77 -

(a)     The Company did not have an "extensive ecosystem" of suppliers that would allow it to scale up at the rates it had promised investors.  As Reeser would later concede, Lightning had always relied on "early-stage, small-volume manufacturers" who had never had to deliver more than a few dozen parts at a time.  Even operating at *that* scale, Lightning had suffered from supply chain shortages that crippled its production capacity.  Lightning's supply chain was simply not sufficient to allow it to scale, let alone in a cost-effective manner during an exacerbated supply chain environment.  Lightning's supply shortages had gotten progressively worse through 2020 into early 2021, such that employees were using whatever parts they could "scrounge" – even older, unreliable parts – with the expectation that they would need to replace them for customers later, just in order to complete vehicles.  Further, Lightning did not have a diversified supply chain, but worked with a small pool of suppliers such that its supply chain disruption risk was substantial, not "mitigated," and left Lightning with little leverage to bring down costs in a market where parts such as electric vehicle batteries were in high demand.  ¶¶79-82, 110-111, 117, 124-126, 131.

(b)     Lightning eMotors' supply chain was not optimized for quality or reliability. The failure rate of Lightning's vehicles was 40 to 50%, and one of the primary reasons was because of unreliable components such as batteries and harnesses.  According to former employees of Lightning, service technicians were frequently called to customer site to replace unreliable batteries in vehicles.  They were also frequently required to make repairs on Lightning vehicles just days after they were delivered to the end customers.  More, quality control was "almost non-existent" at Lightning Systems in early 2021, and Lightning management was more concerned with pushing vehicles out to the customers than with ensuring the components in the vehicles or the vehicles themselves were thoroughly tested.  ¶¶83-84, 110, 112-113, 116-118, 120-123, 128-130; and

- 78 -

(c)      In summer 2021, battery shortages had gotten so severe that a production floor supervisor told his team that they had been directed to take the batteries out of at least six vehicles that had already been fully assembled and gone through the commissioning process, and then put the batteries in other vehicles and fully assemble them.  According to the supervisor, this was done so that the Company could count both sets of vehicles as "completed" and achieve its production quotas. ¶112.

## VI.     ADDITIONAL SCIENTER ALLEGATIONS

### A.     The Individual Defendants' Financial Motives

166.    The GigCapital Defendants were highly incentivized to obtain shareholder approval for and close the Business Combination, by whatever means necessary.  According to the Proxy, identification of a suitable business acquisition target had been ongoing since GigCapital3's IPO in May 2020, and negotiations regarding the Business Combination had been ongoing since at least August 2020.  Given the length of the process from the search through the shareholder vote on April 21, 2021 (11 months), if GigCapital3 shareholders did not approve the Business Combination, GigCapital3 would be unlikely to complete an initial business combination by its specified November 18, 2021 deadline.

167.    But if no initial business combination took place, GigAcquisitions3, Katz, Dinu, and the rest of the GigCapital3 officers and directors would "lose their entire investment [] and w[ould] not be reimbursed for any out-of-pocket expenses."  More, GigCapital3 would be wound up and obligated to redeem 100% of the Company's public shares at a per share price payable in cash. GigAcquisitions3's shares, which accounted for approximately 21.8% of GigCapital3's outstanding shares (and in which each Gig Defendant had financial interest) – and per the Proxy, were valued at

approximately $63.1 million as of March 19, 2021 – would be ***worthless***, as the Initial Stockholder Shares were not redeemable for cash.  And on top of the direct financial losses from an unsuccessful SPAC, GigCapital and the Gig Defendants faced significant damage to their reputations as SPAC sponsors among the investment community – and thus to their ability to complete and profit from future SPAC endeavors – if GigCapital3 failed.  At the same time, because GigAcquisitions3 had purchased more than five million shares for just $0.0044 per share, it would make an enormous profit for the Gig Defendants as long as ***any*** business combination closed, regardless of what price the new company ultimately traded at.  Even if post-closing, the Company's share price fell from $10 to $1 per share, the Gig Defendants would make millions.

168.     The Lightning Defendants were also highly motivated to quickly close the Business Combination.  Lightning Systems desperately needed a capital infusion in order to continue product development and become profitable.  As stated in the Proxy, "[t]he design, manufacture, sale and servicing of [zero-emission vehicles] and electric powertrains is capital-intensive."  At the time it engaged with the Gig Defendants, Lightning Systems was facing significant money problems and needed more capital to fund product development and purchase sufficient parts.  Money was so tight that employees were frequently laid off when orders were cancelled, including a mass layoff in spring 2020, just a few months before its agent, BofA Securities, reached out to the Gig Defendants about a SPAC transaction.  Lightning Systems and its management were so eager for additional liquidity that in August and September 2020, while in the early stages of discussion with GigCapital3, Lightning Systems borrowed $9.7 million at an interest rate of 8%.  According to one former manager, Lightning Systems used these funds to purchase equipment (such as a laser to cut

metals for fabrication and a powder coating machine) to make it a more attractive target for potential investors.

169.    Reeser and Fenwick-Smith also stood to profit financially from the transaction closing as equity holders in Lightning Systems.  Under the Business Combination agreement, Lightning Systems equity holders would receive up to approximately 54 million publicly traded (and thus more liquid) Lightning eMotors shares in exchange for their Lightning Systems equity, and would have the potential to receive up to approximately 16.5 million additional shares of Lightning eMotors stock pursuant to a tranched earn-out arrangement if, within five years, the Company share price reached $12, $14, or $16 for 20 of any 30 consecutive trading days.  And each of the Lightning Defendants would benefit from an equity incentive plan incorporated into the Business Combination Agreement, which would create a pool of equity to be distributed to Company executives.

170.    Additionally, on June 21, 2021, Lightning eMotors disclosed that Defendant Reeser received a massive "bonus" for successfully closing the merger in the amount of $300,000.  On top of the bonus, Defendant Reeser was rewarded with a new annual salary of $500,000 (a nearly $300,000 per annum increase), which was retroactive to May 9, 2021, plus the potential for up to an additional $400,000 in bonuses.  Defendants Fenwick-Smith and Covington also received a "merger closing bonus" in the amount of $50,000.  These staggering financial rewards support a strong inference of scienter.

B.      **Timing of Revelations Supports Scienter**

     1.      **Board of Directors Reclassifies Katz's and Dinu's Terms Days
After Closing, Then Announces Katz, Dinu, and Miotto Will
Not Stand for Re-Election**

171.    The Business Combination closed on May 6, 2021.   A mere ***five days later***, Defendants Katz and Dinu, who had  just been elected as Class III and Class II directors with three- and two-year Board terms per the Proxy, were reclassified by the Lightning Board as Class I directors – meaning their terms would expire as of the first annual stockholders meeting in October 2021.  Miotto, the other Gig Defendant who had been chosen for Lightning's Board, was already a Class I director.  No reason was given for the unceremonious shortening of Defendants Dinu's and Katz's memberships on Lightning eMotors' Board (let alone Katz's tenure as co-Chairman) in the press release Lightning issued on May 12, 2021, in which disclosure of the change was buried. Then, on August 16, 2021, Lightning disclosed that Katz, Dinu, and Miotto would not be running for re-election when their terms expired in two months – again, with no explanation.  As of October 2021, none of the GigCapital3 management team has an active role in Lightning eMotors, in glaring contrast to their representations from the date of the IPO through the shareholder vote that they intended to take an active role in the management and strategy of Lightning for the next three-to-five years.

172.    These events strongly support an inference that the Gig Defendants never had any intention of remaining in a long-term partnership or mentorship role with respect to GigCapital3's acquisition target or, ultimately, Lightning eMotors.  Instead, Defendants were solely interested in the financial gains of closing an initial business combination.

**2.      Lightning Reduces 2021 Guidance Just Weeks After Closing**

173.    Despite the alleged "due diligence" undertaken prior to the closing of the Business Combination, that just days had remained in Lightning Systems' first financial quarter at the time the Proxy, and that the quarter had ended weeks before the shareholder vote (such that Defendants would have had a good idea of what revenue, approximately, Lightning Systems had earned that quarter), it was only days after the Business Combination closed, on May 17, 2021, that Lightning eMotors reduced its 2021 revenue guidance to a range of $50 million to $60 million.  The timing of the disclosure of this revenue decrease is notable, especially in light of Defendants' purported "strong visibility" into their future revenues and that Lightning eMotors was supposedly on track to hit the prior projection of $63 million just a few weeks prior.  The fact that Defendants waited until after the close of the Business Combination to disclose that they were no longer able to hit their $63 million annual revenue target, and in fact could miss the projection by as much as *20%*, is a strong indicium of scienter.

**3.      Lightning Withdraws 2021 Guidance and Announces that Katz, Dinu, and Miotto Will Be Leaving the Board Just Three Months After Closing**

174.    Defendants' August 16, 2021 announcement that they would not meet Lightning eMotors 2021 revenue guidance – which they had revised downward just three months earlier, and had maintained even two weeks prior to the end of the second quarter – strongly supports an inference that they knew, or were reckless in not knowing, that Lightning's stated annual revenue guidance was unachievable at the time it was issued.  More, Defendants' acknowledgment that their revenue guidance was not achievable and Lightning's withdrawal of that guidance was a rapid departure from their pre-Business Combination marketing that 100% of Lightning's 2021 revenue

4864-8659-5614.v1

was already under contract and that it had "[h]igh revenue visibility" into 2021 revenues. This abrupt about-face supports the inference that Defendants hyped the Company's future prospects in hopes of getting shareholder approval for the Business Combination even though they knew, or were reckless in not knowing, that Lightning did not have the operational or supply chain strength necessary to achieve its financial projections.

175.    Additionally, Defendants announced that they would not meet Lightning eMotors' 2021 revenue guidance they had announced just three months earlier, and just over three months from the close of the merger. Defendants' rapid departure from touting that 100% of 2021 revenue was already under contract and they had "[h]igh revenue visibility" right before the merger, to failing to meet guidance and refusing to provide year end guidance just a few months later demonstrates that Defendants hyped the Company in hopes of getting shareholder approval for the merger even though they knew that they would not be able to meet those figures.

**C.     The Gig Defendants' Due Diligence and Conversations with Possible PIPE Investors**

176.    The Proxy describes the background of the Business Combination, including the steps that the Gig Defendants purportedly took in performing due diligence on Lightning Systems, as well as their efforts in obtaining a Private Investment in Public Equity ("PIPE") investor or investors to supplement the amount in the GigCapital3 trust account and to provide additional financing for the Business Combination. PIPE placements are common in SPAC transactions, and often viewed by public investors as an indication of reliability and that the target company is sound. This is because PIPE investors, often well-resourced institutions, are given access to detailed due diligence information about the target company that public investors are not provided, and all before public investors are even aware that the SPAC has identified a target. Typically, PIPE investors are given

- 84 -

investment presentations by the SPAC and target company management, access to information necessary for due diligence, and engage in detailed conversations and negotiations with the SPAC management about the appropriate valuation of the target company and a potential PIPE investment.

177.    According to the Proxy, from October 5, 2020 through November 16, 2020, GigCapital3's underwriters, Lightning Systems, and GigCapital3 "arranged and hosted virtual meetings with prospective investors in the PIPE financing, during which those teams made presentations to and answered questions from prospective PIPE financing investors regarding Lightning Systems' business, with the goal of raising at least $100 and up to $150 million in the PIPE financing based on a proposed pre-money valuation of Lightning Systems equity of $899 million."   The parties met approximately *46 potential investors* in the PIPE financing in 58 meetings.  Yet, when the deal was announced, GigCapital3 had signed up only *one* PIPE investor – BP Technology Ventures, who agreed to take 2.5 million shares at $10 per share, for $25 million. Not only did GigCapital3 fail to obtain nearly the $100-150 million in PIPE financing it had sought, but what is more telling, BP Technology Ventures was already a significant owner of Lightning Systems.  Holding 31.3% of Lightning Systems' private equity at the time the Proxy was issued, BP Technology Ventures, like each of the Gig Defendants, Reeser, and Fenwick-Smith, had a significant financial motive to ensure that the Business Combination closed and that investors believed that Lightning Systems' operations were ready to scale as presented in the Proxy.

178.    Based on potential PIPE investor feedback, (and regardless of their own purported earlier due diligence), the Gig Defendants renegotiated the Business Combination Agreement to reflect a reduced pre-money valuation of Lightning Systems to $539 million – a decrease of *40%*. Still, the Defendants could not obtain any independent PIPE investment.  Ultimately, the Gig

Defendants had to create a new funding vehicle – convertible notes with a 7.5% interest rate – and once again hold meetings with the previous investment targets to fund the Business Combination. It is simply inconceivable that this months-long process, which purportedly accompanied the Gig Defendants' own due diligence, did not reveal to the Gig Defendants that Lightning Systems' financial projections were unachievable and that it would not be able to scale at the rate investors were promised.

      **D.**      **Lightning's Chief Procurement Officer Resigns After Just Two Months on the Job**

179.      As part of the Gig Defendants' and Lightning Defendants' efforts to show investors prior to the Business Combination that Lightning Systems was ready to scale and succeed as a public company, Lightning Systems announced that it had created and filled several executive-level positions, such as a permanent CFO (Defendant Covington) and a head of sales (Chief Revenue Officer Kash Sethi). On March 16, 2021, Lightning Systems issued a press release announcing the hiring of its first Chief Procurement Officer, who would "join the company's senior leadership team and lead all purchasing activities as well as quality and the performance of the supply base." It was announced that the role would be taken by Stephen Ivsan, a veteran of both the electric vehicle and traditional automobile manufacturing industries who, among other positions, had served as chief procurement officer at Lightning competitor Rivian, as well as the director of vehicle purchases at Tesla, and had most recently been the chief procurement officer at an autonomous vehicle start-up company in the logistics industry. On May 11, 2021, the Lightning eMotors Board named Ivsan an executive officer of the Company.

180.      Yet, despite having touted Ivsan's hire just two months earlier, Lightning disclosed in a Form 8-K filed with the SEC on June 2, 2021, that Ivsan had resigned on May 27, 2021, two

months into his first full financial quarter as Chief Procurement Officer.  Ivsan's abrupt resignation after just ten weeks at Lightning, which also involved giving up a significant portion of his compensation package that had not yet vested, was highly unusual.  The unexplained departure of an experienced automotive supply chain executive like Ivsan after so short a tenure managing Lightning's supply chain which (i) occurred less than one month following the closing of the Business Combination and less than two weeks after Lightning announced that it was reducing its financial guidance, and (ii) would be followed by Lightning's August 16, 2021 announcement that it was withdrawing the 2021 financial guidance it had provided in the Proxy due to purportedly unexpected supply chain issues, suggests that Lightning's supply chain and operations were not nearly as mature or robust as investors had been told.

### E.    Prior GigCapital SPACs Richly Rewarded the Gig Defendants, But Cost Their Shareholders

181.    Lightning eMotors was not the only SPAC combination completed by GigCapital Global and its subsidiaries in which the newly public company's stock price immediately tanked in the months following completion of the de-SPAC process.  At the time each of these business combinations were completed, GigCapital Global touted the same promising future for its target acquisitions as it did with respect to Lightning Systems.  For example, GigCapital Global emphasized that additional capital would allow Kaleyra to "'expand and accelerate [its] growth plans.'"  GigCapital Global boasted about BigBear.ai Holding Inc.'s ("BigBear") "robust contract backlog" as a promising signal of its ability to "accelerate growth."  The combination with UpHealth, Inc. ("UpHealth") was no different, with GigCapital Global claiming that the "'significant growth capital'" allowed the company to "'rapidly deploy [their] solutions'" and "'accelerate its

growth.'"   In each instance, some or all of the Gig Defendants, through the SPAC sponsor, purchased millions of shares for practically nothing.

182.     But each of these companies suffered substantial stock drops in the months following their combinations with GigCapital Global's respective subsidiaries.  After Kaleyra combined with GigCapital, Inc. on November 22, 2019, the stock (NYSE: KLR) closed at $10.70 per share.  By June 26, 2020, the Kaleyra stock had cratered to $3.88 per share.  Similarly, GigCapital2, Inc. completed its merger with UpHealth on June 4, 2021, barely a month after GigCapital3 closed with Lightning eMotors.  When trading began on June 10, 2021, the stock (NYSE: UPH) closed at $9.93 per share.  By October 5, 2021 the UpHealth stock tanked to just $1.67 per share.  In GigCapital Global's most recent acquisition of BigBear, which was approved on December 3, 2021, shares (NYSE: BBAI) closed at $9.25 per share on their first day of trading on December 8, 2021.  Barely even a month later, the share price had dipped to $4.73 per share on January 13, 2022.  These drops are consistent with what happened at Lightning eMotors, indicating that the Gig Defendants either: (i) have engaged in a pattern of knowingly or recklessly overinflating the value of their SPACs' targets; or (ii) are reckless in failing to properly evaluate their targets and do not perform adequate due diligence prior to completing their business combinations.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

183.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and made materially false and misleading statements that: (1) the Gig Defendants would remain actively involved with Lightning's business strategy and management for three-to-five years; (2) Lightning's supply chain was robust, extensive, and resilient; (3) Lightning was well-positioned to rapidly scale operations; and (4) Defendants had high visibility into Lightning's

- 88 -

financial projections and that they were achievable.  By artificially inflating and manipulating the price of Lightning eMotors securities, Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, it caused Lightning eMotors' stock price to fall precipitously as the prior artificial inflation left the stock price.  As a result of their purchases of Lightning eMotors securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

184.    On August 16, 2021, after the markets closed, Lightning eMotors issued its 2Q21 financial results in a press release and Form 10-Q filed with the SEC.  The press release announced, *inter alia*, that: (i) Lightning had produced only 67 vehicles in the first six months of 2021 (compared to prior full-year guidance of 500); (ii) revenues for the first six months were just $10.1 million (compared to prior full-year guidance of $63 million); and  (iii) Lightning no longer expected to meet and was withdrawing its full-year financial guidance altogether.  The Form 10-Q further revealed that Gig Defendant-directors Miotto, Dinu, and co-Chairman Katz would not be seeking re-election to the Board when their terms expired on October 7, 2021.

185.    Following this news, Lightning eMotors' stock price dropped from a closing price on August 16, 2021 of $9.63 per share to close at $8 per share on August 17, 2021 – ***a single-day decrease of 17%***.  With an abnormally high 5.1 million shares traded, this resulted in a loss of market capitalization of $119.64 million.  Financial analysts at Benchmark reduced their price target from $17 per share to $14 per share, while Bank of America noted, "Lightning e-Motors has seen substantial supplier disruption, and it remains to be seen if the firm can ramp production with an increasingly complex supply chain."

186.    The decline in the price of Lightning eMotors securities after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market and were a substantial cause of the decline.   The timing and magnitude of the price decline that Lightning eMotors securities experienced compared to those of its peers and the overall market negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Lightning eMotors securities and the subsequent significant decline in the value of Lightning eMotors securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   PRESUMPTION OF RELIANCE

187.    The market for Lightning eMotors securities was open, well-developed, and efficient at all relevant times.  As a result of the Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Lightning eMotors.  The Plaintiffs and Class members have been damaged thereby.

188.    During the Class Period, the artificial inflation of the value of Lightning eMotors securities was caused by the material misrepresentations and omissions and fraudulent acts alleged in this Complaint, thereby causing the damages sustained by Plaintiffs and other Class members.  As

alleged herein, during the Class Period, Lightning eMotors, the Gig Defendants, the Control Entity Defendants, and the Lightning Defendants made or caused to be made a series of materially false or misleading statements about and the intention of the GigCapital team to remain involved with the Company following the Business Combination, and the Company's business, prospects, and operations, impairing shareholders' rights to vote on the Business Combination and causing the price of the Company's securities to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

189.    At all relevant times, the market for Lightning eMotors securities was an efficient market for the following reasons, among others:

(a) Lightning eMotors securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Lightning eMotors filed periodic public reports with the SEC and the NYSE;

(c) Lightning eMotors regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Lightning eMotors was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

190.    Based on the foregoing, during the Class Period, the market for Lightning eMotors securities promptly digested information regarding the Company from all publicly available sources and incorporated such information into the price of Lightning eMotors securities.  Under these circumstances, the market for Lightning eMotors securities was efficient during the Class Period

and, therefore, investors' purchases of Lightning eMotors securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

191.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' fraudulent scheme and false and misleading statements during the Class Period involved omissions of material facts.  These omissions concealed, among other things, and as alleged more fully above, (i) operational challenges, (ii) predictable delays in vehicle deliveries as a result of an immature and concentrated supply chain, and (iii) the GigCapital team's intent to extricate itself from the Company soon after the Business Combination was completed, and were done to induce investors to buy GigCapital3 and Lightning eMotors securities, vote for the Business Combination, and create a false impression that Lightning eMotors was well-positioned to rapidly scale operations and meet its stated financial projections.

## IX.    NO SAFE HARBOR

192.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Lightning eMotors' business prospects and positioning for scalability.

193.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements are not protected by the statutory safe harbor as they were made in the context of a de-SPAC transaction, which the SEC has clarified in recent statements

should be treated in the same manner as an IPO for purposes of forward-looking statements and projections.

194.     Further, to the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted the statements by the Defendants regarding Lightning eMotors' operations and prospects and the GigCapital team's plan for continued involvement following the Business Combination, among others.  Given the then-existing facts contradicting the statements by the Defendants, any generalized risk disclosures made by Lightning eMotors were not sufficient to insulate the Defendants from liability for their materially false and misleading statements.

195.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by executive(s) or director(s) of Lightning or its predecessor entity who knew the statement was false when made.

## X.     CLASS ACTION ALLEGATIONS

196.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities, excluding Excluded Persons, who: (a) purchased or otherwise acquired publicly traded securities issued pursuant to the May 13, 2020 registration statement filed by GigCapital3, Inc.; (b) were shareholders of GigCapital3 as of the March 15, 2021 Record Date

and were entitled to vote on the Business Combination; and/or (c) purchased or otherwise acquired Lightning eMotors securities from May 18, 2020 through August 16, 2021, inclusive.

197.    The Class is so numerous that joinder of all members is impracticable.  For example, Lightning eMotors reported in its August 16, 2021 Form 10-Q that there were approximately 73.4 million public shares of Lightning eMotors common stock issued and outstanding, likely held by thousands of persons.

198.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include:

(a) whether Defendants misrepresented material facts;

(b) whether the Gig Defendants made materially false and misleading statements in the Registration Statement;

(c) whether the Defendants were negligent in making material misrepresentations and/or omissions in the Proxy;

(d) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) whether Defendants engaged in a scheme to defraud;

(f) whether the prices of Lightning eMotors' securities were artificially inflated;

(g) whether certain Defendants are liable as "controlling persons" under §15 of the 1933 Act and/or §20(a) of the 1934 Act; and

(h) whether Plaintiffs and the other members of the Class were injured as a result of Defendants' misconduct.

199.    Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs are not subject to any atypical claims or defenses.

200.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

201.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Violation of Section 11 of the 1933 Act
### Against Lightning eMotors and the Gig Defendants

202.    Plaintiffs repeat and reallege ¶¶1-5, 10, 12, 14-37, 42-54,  85-88, 101-104, 132-133, 196-201 as if set forth herein.

203.    This count is brought by all Plaintiffs on behalf of themselves and all persons who purchased or otherwise acquired securities traceable to the Registration Statement.

204.    This count is brought against Lightning eMotors and the Gig Defendants.

205.    Plaintiffs assert solely strict liability and negligence claims in this count.

206.    On May 12, 2020, GigCapital3 filed the Registration Statement with the SEC.  The Registration Statement was declared effective on May 13, 2020, and the final prospectus issued pursuant thereto was filed on May 15, 2020.  GigCapital3 conducted its IPO on May 18, 2020.  The Registration Statement represented that GigCapital3 and the GigCapital Defendants would:

(a)    "apply a unique 'Mentor-Investor' philosophy to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company";

(b)    "help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination";

- 95 -

(c)      "seek[] Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion"; and

(d)      "prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors."

207.    In including such statements, the Registration Statement falsely and misleadingly represented that the Gig Defendants, with their highly-touted experience in the TMT industry and public companies, would remain actively engaged for several years after an initial business combination between GigCapital3 and an acquisition target closed in order to assist with the fledgling public company's growth and success.  The true facts were that the Gig Defendants had no such intention and would not remain engaged in the management or strategy of the target company for more than a few months following the closing of the business transaction.  Indeed, the Gig Defendants began backtracking on their promises of active engagement just days after the Business Combination was consummated, shortening Katz's and Dinu's tenures on Lightning's board – which they had recommended shareholders vote "For" just a few weeks earlier – by years.

208.    GigCapital3, now called Lightning eMotors, was the issuer of securities registered in the Registration Statement.  Lightning eMotors is therefore strictly liable to the members of the Class who received Lightning eMotors securities issued pursuant to the Registration Statement.

209.    The Gig Defendants were each signatories to, and were responsible for the contents and dissemination of, the Registration Statement and are therefore liable to members of the Class who received Lightning eMotors securities issued pursuant to the Registration Statement for the materially false and misleading statements therein.

210.     Each of the Plaintiffs and the members of the Class who acquired Lightning eMotors securities traceable to the Registration Statement suffered damage as a direct and proximate result of the untrue and/or misleading statements of material fact described in this count.

211.     This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Plaintiffs and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based.  Less than three years have elapsed from the time that Plaintiffs and other Class members received their Lightning eMotors securities pursuant to the Registration Statement.

212.     By reason of the foregoing, the Defendants named in this count have violated §11 of the 1933 Act.

## COUNT II

### Violations of Section 15 of the 1933 Act
### Against the Gig Defendants and Control Entity Defendants

213.     Plaintiffs repeat and reallege the allegations in ¶¶1-5, 10, 12, 14-37, 42-54,  85-88, 101-104, 132-133, 196-212 as if fully alleged in this count.

214.     This count is brought by all Plaintiffs on behalf of themselves and all other Class members who received Lightning eMotors securities issued pursuant to the Registration Statement.

215.     This count is brought against the Gig Defendants and Control Entity Defendants.

216.     Plaintiffs assert solely strict liability and negligence claims in this count.

217.     The Gig Defendants and Control Entity Defendants were each control persons of GigCapital3 (now Lightning eMotors) at the time of the IPO.  The Gig Defendants exercised actual power over GigCapital3 by virtue of their positions as directors and/or executive officers of GigCapital3 and/or their beneficial ownership and/or control of GigCapital3 through the Control

- 97 -

Entity Defendants.  The Control Entity Defendants also exercised actual power over GigCapital3 as the creators and owners of GigCapital3.  The Gig Defendants and Control Entity Defendants were able to, and did, influence, directly and indirectly, the contents of the Registration Statement.

218.    By reason of the foregoing, the Defendants named in this count violated §15 of the 1933 Act.

**COUNT III**

**Violations of Section 14(a) of the 1934 Act**
**Against Lightning eMotors and the Gig Defendants**

219.    Plaintiffs repeat and reallege the allegations in ¶¶1-88, 101-131, 134-155, 166-201, as if fully alleged in this count.

220.    This count is brought by all Plaintiffs on behalf of themselves and all other shareholders who were eligible to vote on the Business Combination.

221.    This count is brought against Lightning eMotors and the Gig Defendants.

222.    Plaintiffs assert solely negligence claims in this count.

223.    The Proxy was an essential link in the consummation of the Business Combination and GigCapital3 (now Lightning eMotors) successfully solicited shareholders to approve the Business Combination using the Proxy and materials incorporated therein.  Specifically, the Proxy represented that Lightning Systems was on track to achieve $63 million in revenue in 2021 with a 14% gross profit margin, and $354 million in 2022 with a 19% gross profit margin.  It represented that Lightning Systems had "long-term relationships with supply chain partners [that] ha[d] prepared [Lightning] to scale in a cost effective manner" and that it had "optimize[d] [its] supply chain for quality, reliability, and cost" and "maintain[ed] a high degree of resilience in [its] supply chain" in order to "mitigat[e] delays."  It further represented that Lightning eMotors had "built an extensive

- 98 -

ecosystem of supply-chain partners."   The Proxy also represented that Lightning Systems had current capacity to manufacture and assemble 500 vehicles and/or powertrain units per year.

224.    These representations and the others identified in ¶¶146-150 were materially false and misleading, and omitted material facts necessary to make the statements not misleading, when made. As detailed in ¶¶146-151, the financial projections for Lightning Systems included in the Proxy Statement were unachievable, and far from having a robust and extensive supply chain, the Company had long suffered supply shortages and supplier quality problems, leading to reliability problems with the vehicles.  Put simply, Lightning Systems was not well-positioned to scale its operations at nearly the rate represented.

225.    The Proxy also represented that the Gig Defendants had identified Lightning Systems as a target business while "seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion," and that the Gig Defendants "through [their] Mentor-Investment approach, will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation."  These statements were materially false and misleading, as the Gig Defendants did not remain actively engaged in Lightning eMotors' business strategy and management over a three-to-five year horizon, nor did they employ the "Mentor-Investment approach" detailed in their marketing materials.  Instead, the Gig Defendants ended their active involvement with Lightning eMotors within six months of the Business Combination.

226.    The Proxy also incorporated other misrepresentations and omitted material facts necessary to make the statements therein not false or misleading, as detailed in ¶¶146-150, including explicitly stating that "the terms of the Business Combination were fair to and in the best interests of

the Company and its stockholders" and based thereon recommended that shareholders vote in favor of the Business Combination.

227.     Shareholders entitled to vote on the Business Combination and that held their shares through the closing of the Business Combination were damaged as a direct and proximate result of the untrue statements of material fact and/or omissions alleged in this count that were included in the Proxy.

228.     As a result of the false and misleading Proxy, shareholders were induced to vote in favor of the Business Combination.  The artificial inflation in Lightning eMotors' stock price was removed when the Defendants' misrepresentations and omissions made in the Proxy were revealed, causing Plaintiffs' losses.

229.     Each Defendant named in this count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated in order to make the statements contained in their solicitations not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the April 21, 2021 shareholder vote.

230.     This count is brought within the applicable statute of limitations.

231.     By reason of the foregoing, the Defendants named in this count violated §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

4864-8659-5614.v1

## COUNT IV

**Violations of Section 20(a) of the 1934 Act
Against the Control Entity Defendants, the Gig Defendants,
and the Lightning Defendants**

232.     Plaintiffs repeat and reallege the allegations in ¶¶1-88, 101-131, 134-155, 166-201, 219-231 as if fully alleged in this count.

233.     This count is brought by all Plaintiffs on behalf of themselves and all Class members who were eligible to vote on the Business Combination and held their shares through the closing of the Business Combination.

234.     This count is brought against the Control Entity Defendants, the Gig Defendants, and the Lightning Defendants.

235.     The Gig Defendants and Control Entity Defendants were each control persons of GigCapital3 at the time GigCapital3 issued and disseminated the Proxy and related proxy solicitation materials.  The Gig Defendants exercised actual power over GigCapital3 by virtue of their positions as directors and/or executive officers of GigCapital3 and/or their beneficial ownership and/or control of GigCapital3 through the Control Entity Defendants.  The Control Entity Defendants also exercised actual power over GigCapital3 as the creators and owners of GigCapital3.  The GigCapital Defendants and Control Entity Defendants were able to, and did, influence, directly and indirectly, the filing and contents of the Proxy and related proxy solicitation materials.

236.     The Lightning Defendants were each control persons of Lightning Systems at the time that GigCapital3 issued and disseminated the Proxy and related proxy solicitation materials.  The Business Combination Agreement provided that GigCapital3 could not file, amend, or supplement the Proxy without the approval of Lightning Systems.  Accordingly, each of the

- 101 -

Lightning Defendants were able to, and did, influence, directly and indirectly, the filing and contents of the Proxy and related proxy solicitation materials.

237.    As a direct and proximate result of the Gig Defendants', Control Entity Defendants', and Lightning Defendants' wrongful conduct in causing the filing and dissemination of the Proxy and related proxy solicitation materials containing untrue and materially misleading statements of fact and/or omitting facts necessary to make those statements not misleading, Plaintiffs and members of the Class on whose behalf this count is brought suffered damages.

238.    By reason of the foregoing, the Defendants named in this count violated §20(a) of the 1934 Act in connection with the Business Combination.

## COUNT V

### Violations of Section 10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against Lightning eMotors, the Gig Defendants, and the Lightning Defendants

239.    Plaintiffs repeat and reallege the allegations in ¶¶1-201, above, as if set forth herein.

240.    This count is brought by Plaintiff Tye on behalf of himself and the Class.

241.    This count is brought against Lightning eMotors, the Gig Defendants, and the Lightning Defendants.

242.    During the Class Period, each of the Defendants named in this count disseminated or approved the statements as specified above in ¶¶132-165, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243.     The Defendants named in this count violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff Tye and others similarly situated in connection with their purchases of Lightning eMotors securities during the Class Period.

244.     The Defendants named in this count, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Lightning eMotors' operations and positioning to scale, as well as the Gig Defendants' plans for continued active involvement in Lightning eMotors following the Business Combination closing, as specified herein.

245.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

246.     As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lightning eMotors securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's

- 103 -

securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Plaintiff Tye and the other Class members purchased or otherwise acquired Lightning eMotors securities during the Class Period at artificially high prices and were damaged thereby.

247.     Plaintiff Tye and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Lightning eMotors securities, and suffered losses when the relevant truth was revealed.  Plaintiff Tye and the Class would not have purchased Lightning eMotors securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

248.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff Tye and the other Class members suffered damages in connection with their Class Period transactions in Lightning eMotors securities.  By reason of the foregoing, Defendants named in this count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

## COUNT VI

### Violations of Section 20(a) of the 1934 Act Against the Gig Defendants, Control Entity Defendants, and Lightning Defendants

249.     Plaintiffs repeat and reallege the allegations in ¶¶1-201, 239-248, above, as if set forth herein.

250.     This count is brought by Plaintiff Tye on behalf of himself and the Class.

251.     This count is brought against the Gig Defendants, Control Entity Defendants, and Lightning Defendants.

252.     The Gig Defendants and Control Entity Defendants were each control persons of GigCapital3.  The Gig Defendants exercised actual power over GigCapital3 by virtue of their

- 104 -

positions as directors and/or executive officers of GigCapital3 and/or their beneficial ownership and/or control of GigCapital3 through the Control Entity Defendants.  The Control Entity Defendants also exercised actual power over GigCapital3 as the creators and owners of GigCapital3.

253.    The Lightning Defendants were each control persons of Lightning eMotors by virtue of their positions as executive officers and/or directors.

254.    Each of the Defendants named in this count acted as controlling persons of Lightning eMotors within the meaning of §20(a) of the 1934 Act.  By virtue of their high-level positions as officers and/or directors of Lightning eMotors and/or its predecessor entities, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Lightning eMotors and/or its predecessor entities, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

255.    In particular, each of these Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count V, and exercised that power.

256.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff Tye and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's securities during the Class Period when the relevant truth was revealed.

4864-8659-5614.v1

257.     By reason of the foregoing, the Defendants named in this count violated §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B.     Awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.     Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.     Awarding Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: May 20, 2022                  ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     DANIEL S. DROSMAN
                                     HILLARY B. STAKEM
                                     HEATHER G. SCHLESIER


                                           s/ HILLARY B. STAKEM
                                     _____
                                           HILLARY B. STAKEM

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
hstakem@rgrdlaw.com
hschlesier@rgrdlaw.com

JOHNSON FISTEL, LLP
JEFFREY A. BERENS
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: 303/861-1764
303/861-1764 (fax)
jeffb@johnsonfistel.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

Lead Counsel for Lead Plaintiff

4864-8659-5614.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 20, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ HILLARY B. STAKEM
HILLARY B. STAKEM

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  hstakem@rgrdlaw.com

5/19/22, 11:35 AM                                                        CM/ECF - U.S. District Court:cod-

## Mailing Information for a Case 1:21-cv-02774-RMR-KLM Shafer v. Lightning eMotors, Inc et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com

- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,jeffb@johnsonfistel.com,jeffreyberens@comcast.net

- **Boris Feldman**
  boris.feldman@freshfields.com,caroline.bane@freshfields.com,usmanagingattorneyteam@freshfields.com,6188914420@filings.docketbird.com,anthony.denatale@fr

- **Michael I. Fistel , Jr**
  michaelf@johnsonfistel.com,paralegal@johnsonfistel.com

- **Doru Gavril**
  doru.gavril@freshfields.com,usmanagingattorneyteam@freshfields.com,6188914420@filings.docketbird.com,anthony.denatale@freshfields.com,sheana.chandar@fres

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Drew Stansell Liming**
  drew.liming@freshfields.com,usmanagingattorneyteam@freshfields.com,anthony.denatale@freshfields.com,sheana.chandar@freshfields.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dand@rgrdlaw.com,HSchlesier@rgrdlaw.com,tholindrake@rgrdlaw.com,dmyers@ecf.courtdrive.com,mwaligurski@rgrdlaw.com,HStakem@rg

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Melanie E. Walker**
  melanie.walker@us.dlapiper.com

- **Margaret Abigail West**
  abigail.west@freshfields.com

- **James Milligan Wilson , Jr**
  jwilson@faruqilaw.com,ecf@faruqilaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)